WSM, INCORPORATED, Appellant,

v.

Dennis E. HILTON and Country Shindig Opry, Inc., Appellees.

No. 82–2139.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1983.

Decided Jan. 12, 1984.

James W. Gallaher, Bushmann, Neff, Gallaher & Brown, Jefferson City, Mo., Lionel L. Lucchesi, Polster, Polster & Lucchesi, St. Louis, Mo., for appellees.

L. Lawton Rogers, III, Arlington, Va., Francis M. Wentworth, Jr., Nashville, Tenn., for appellant.

Before JOHN R. GIBSON, and FAGG, Circuit Judges, and WOODS,* District Judge.

JOHN R. GIBSON, Circuit Judge.

"Opry," what it means and whether the word, as a registered trademark of WSM, Incorporated, was infringed by Dennis Hilton and his Country Shindig Opry are the primary issues in this case. WSM is also the holder of trademarks for Grand Ole Opry and several marks using Opryland. The district court[1] found that "opry" was generic, that there was no confusion between the Country Shindig Opry and the various marks and enterprises of WSM, and that a permanent injunction should be denied WSM. WSM argues on appeal that the court erred in holding "opry" to be generic, in holding that there was no likelihood of confusion between the Country Shindig Opry and WSM's opry family of marks, and in limiting its consideration of dilution to "opry" and to a likelihood of confusion. We affirm the judgment of the district court.

WSM first made commercial use of the word "opry" in 1927 when the WSM Barn Dance Radio Program, which immediately followed a program of classical music, was referred to as the "Grand Ole Opry." "Grand Ole Opry" was registered as a trademark by WSM on July 11, 1950. WSM registered "Opryland USA" on February 6, 1973, a design of the same name on February 26, 1974, "Opryland Hotel" on February 17, 1981, and a design on April 14, 1981, "Opryland" for an amusement park on April 28, 1981, and "Opryland Talent Agency" on August 4, 1981.

"Opry" was registered by WSM on January 12, 1982. Over the years WSM has operated the various enterprises, including the presentation of the Grand Ole Opry.

Dennis Hilton commenced operating the Country Shindig on May 25, 1970, and used that name until the summer of 1973 when the business name was changed to Denny Hilton's Country Shindig Opry Show. As found by the district court, the name was changed after Hilton learned that potential customers believed that the show consisted wholly of dancing. On February 17, 1976, Hilton became the owner of a registered mark known as "Country Shindig."

In each of the years 1979 through 1982, WSM demanded that Hilton cease his alleged infringement of the mark "Grand Ole Opry." This action was brought in the spring of 1982 making the following claims against Hilton and the Country Shindig Opry: (1) infringement of WSM's registered trademarks in violation of 15 U.S.C. § 1114(1) (1963); (2) engaging in unfair competition in violation of 15 U.S.C. § 1125 (1982) and Missouri common law; and (3) diluting the distinctiveness of WSM's trademarks in violation of § 417.061 of the Revised Statutes of Missouri.

Following a two-day trial, the court entered its order and extensive findings of fact.[2] The court stated that the word

---

* The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

1. The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

2. The court's findings included the following:
 10. The word "opera" has been in common use from the eighteenth century to the present in connection with classical grand opera and with satirical references to grand opera. Several of the satirical references to grand opera include "horse opera," "medicine opera," "jig opera," and "burnt-cork opera." A "horse opera" describes a particular genre of cowboy-western movie in which western folk songs are sung by the cowboys. A "medicine opera" describes an entertainment program which often consists of the showing of a short motion picture, of the live performance of folk or country songs and dances, of comical displays by white persons disguised as Negroes, and of the sale of medicinal and other goods. A "jig opera" or "burnt-cork opera" describes a minstrel show performed by black persons or white persons with blackened faces. These types of "operas" were often performed in the town "opera house."
 11. Certain persons who reside along the mid-Atlantic seaboard, in Appalachia and in the Ozarks have adhered to a rule of pronunciation under which words ending with the letter "a" are pronounced as if the word ended with the letter "y." The word "opera"

"opry" is a dialectical variation of "opera," which has been in common use from the eighteenth century to the present, and that "opry" has been and is now used to describe a show consisting of country music, dancing, and comedy routines. The court found that the public is aware of the different ownership of the Grand Ole Opry and Denny Hilton's Country Shindig Opry Show and has exhibited no confusion in distinguishing them. *WSM, Inc. v. Hilton,* 545 F.Supp. 1212, 1214–16 (W.D.Mo.1982).

The district court held that the test of infringement under § 1114(1) required a showing that confusion, mistake or deception is likely to occur in the minds of the public. It found that "opry" was the only possible cause for confusion and concluded that

> is among at least 175 words to which this rule of dialectic pronunciation applies. For example, "opera" is pronounced as "opery" or "opry." The horse, medicine and jig operas were often respectively referred to as "horse opry" or "hoss opry," "medicine opry" or "med-opry," and "jig opry."
>
> 12. ... The adoption of the "Grand Ole Opry" mark by WSM had its origin in the satirical contrast on a program of grand opera which immediately preceded the WSM Barndance Radio Program. Judge George D. Hay, the WSM radio announcer for the Barndance, established the satirical reference when he commented on the program that "for the past hour we have been listening to music taken largely from grand opera, but from now on we will present, 'The Grand Ole Opry.'" Judge Hay, as a newspaper reporter who lived in close contact with the rural and mountain people of Tennessee, was aware of their common vernacular, was familiar with the dialectic variation of "opera" as "opry" and knew that the satirical comparison with grand opera would be enhanced by the use of the word "opry."
>
> 13. The word "opry" is listed and defined in *Webster's New Third International Dictionary* as a dialectic variation of the word "opera" and as a substandard word which is today used by certain portions of the speaking American public. The use of the word "opry" is more likely to occur in oral speech rather than in printed matter. *The American Thesaurus of Slang* lists "opry" as a "musical performance," describes an "opery house" as a "theatre," and includes "horse opera" and "hoss opry" among terms referred to a "circus."
>
> 14. The word "opry" has been and is now used in connection with country music per-

the members of the public who purchase country music entertainment services exercise a degree of care which obviates the likelihood that they will be confused as to whose services they are purchasing. The public has exhibited no confusion in distinguishing between Lee Mace's Ozark Opry and Denny Hilton's Country Shindig Opry Show, or in distinguishing between the Grand Ole Opry and Denny Hilton's Country Shindig Opry Show. Persons who attended the Ozark Opry or the Country Shindig Opry Show do not believe that they are attending a performance of the Grand Ole Opry.

*Hilton, supra,* 545 F.Supp. at 1217.

The district court also concluded that no evidence was introduced by WSM which

> formances of various types. Cowboy performers in the "horse oprys" sang western songs. Minstrels in the "medicine," "jig" and "burnt-cork" oprys sang country and folk songs, and danced to similar music. Today, the word "opry" describes a show consisting of country music, dancing and comedy routines. It does not always connote "Grand Ole Opry" when it is used in oral or written discourse. When "opry" is used in connection with a description of the country music entertainment services provided by the Grand Ole Opry, it connotes the Grand Ole Opry. Similarly, when it is used in connection with the country music entertainment services provided by other organizations, like Dennis Hilton's Country Shindig Opry Show, Lee Mace's Ozark Opry, the Grapevine Opry, the Union Mill Opry, the Country Hayride Opry, and the Kansas City Opry, it connotes those organizations.
>
> 19. Lee Mace's Ozark Opry and Denny Hilton's Country Shindig Opry have competed directly in the area surrounding Osage Beach, Missouri since 1973. The public is cognizant of the different ownership of the two shows and has exhibited no confusion in distinguishing them. The defendants' use of the business title "Denny Hilton's Country Shindig Opry Show" has not caused confusion in the minds of the public with respect to the Grand Ole Opry or any of the marks owned by WSM. Persons who attend the Ozark Opry or the Country Shindig Opry Show do not believe they are attending a performance of the Grand Ole Opry. Some customers of the Ozark Opry have inquired as to whether there is some association between the Ozark Opry and Grand Ole Opry. The Ozark Opry is a licensee of WSM. The Country Shindig Opry is not.

showed that the public was actually confused about whether there was an association between Grand Ole Opry and Denny Hilton's Country Shindig Opry Show.

The district court held that the prima facie showing of WSM's exclusive right to use Opry as its mark under 15 U.S.C. § 1115(a) (1982) was rebutted by a showing that the word "opry" is generic. The buyer understanding test was applied. The court found that "opry" is a generic word which connotes in the minds of the public a country music performance that includes dancing and comedy routines. The court further found that the generic nature of the word "opry" did not change in 1927 when WSM commenced its commercial use of the word.

The district court concluded that WSM had not shown violation of Section 43(a) of the Lanham Act, 115 U.S.C. § 1125(a), or the Missouri common law of unfair competition because the use of the word "opry" by Hilton does not amount to a false description or representation since the word is generic. It concluded that because of its finding that the business entitled "Denny Hilton's Country Shindig Opry Show" is not likely to cause confusion or misapprehension in the minds of the public with respect to the marks owned by WSM, there was no basis for a common law unfair competition claim. The district court also rejected WSM's claim of violation of the Missouri Anti-Dilution Statute, Mo.Rev.Stat. § 417.061 (1978), concluding that since "opry" is generic, the question of dilution does not arise.

WSM's request for a permanent injunction was denied. On appeal WSM argues that whether "opry" is generic must be evaluated at a relevant time and in a relevant market, and the district court erred in failing to so consider the issue. WSM argues that the evidence does not support the findings of the district court in this respect. It further argues that the district court failed to consider all of WSM's marks individually and collectively, and that it failed to consider Hilton's intent. WSM argues that the court's conclusion that the public

associated Grand Ole Opry and Ozark Opry but found no inference of confusion between Grand Ole Opry and Country Shindig Opry was inconsistent. It further argues that the court improperly limited its consideration to "opry" with respect to dilution and did not consider the other marks in the "opry family," and limited its analysis to likelihood of confusion contrary to the clear language of the statute.

I.

A generic term refers to "a particular genus or class of which an individual article or service is but a member," *Soweco, Inc. v. Shell Oil*, 617 F.2d 1178, 1183 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976); it suggests the "basic nature of articles or services." *Soweco, supra*, 617 F.2d at 1183. The test for deciding whether a word has become a generic title of a product or service is one of buyer understanding: "What do the buyers understand by the word for whose use the parties are contending?" *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 463 (3d Cir.1968), *cert. denied*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968), (*quoting Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (S.D.N.Y. 1921)). *See also Miller Brewing Co. v. Jos. Schlitz Brewing Co.*, 605 F.2d 990 (7th Cir. 1979), *cert. denied*, 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980). We must apply the same test to our question which is one involving entertainment services.

How a particular word has been used and how it has been understood by the public is a question of fact. *Dresser, supra*, 395 F.2d at 461. A term for which trademark protection is claimed will fall in one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. These categories, like colors in a spectrum, tend to blur at the edges and merge together, making it difficult to apply the appropriate label. *Soweco, supra*, 617 F.2d at 1183; *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir.1979), *cert. de-*

nied, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980). The correct categorization of a given term is also a factual issue. *Soweco, supra* 617 F.2d at 1183 n. 12; 3 Callmann, *The Law of Unfair Competition, Trademarks and Monopolies,* 66 (Cum.Supp. 1982).

We therefore review the district court's findings under the clearly erroneous standard of Rule 52 of the Federal Rules of Civil Procedure. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 793 (5th Cir.1983); *Walt-West Enterprises, Inc. v. Gannett Co.,* 695 F.2d 1050, 1059 (7th Cir.1982); *Hindu Incense v. Meadows,* 692 F.2d 1048, 1050 (6th Cir.1982); *Anti-Monopoly, Inc. v. General Mills Fun Group, Inc.,* 684 F.2d 1316, 1318 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983); *Dresser, supra,* 395 F.2d at 461.

Under the Lanham Act, 15 U.S.C. § 1057(b) (1976), WSM's registration of "opry" "shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate (of registration) ...." The presumption created by the Lanham Act is a rebuttable one, *Vision Center, supra,* 596 F.2d at 119, which shifts the burden of proof to the one questioning the trademark. *Dymo Industries, Inc. v. Tapeprinter, Inc.,* 326 F.2d 141, 143 (9th Cir.1964); *Iowa Farmers Union v. Farmers' Educational Union,* 247 F.2d 809, 818 (8th Cir.1957). The statutory presumption may be overcome by establishing the generic nature of the mark. *Vision Center, supra,* 596 F.2d at 119. WSM contends that the evidence presented by Hilton failed to overcome this burden. After carefully reviewing the record we conclude that the evidence presented supports the district court's finding that "opry" is a generic term, and that this finding is not clearly erroneous.

The evidence establishes that "opry" was in common use before WSM began using it in 1927. Both the testimony of Dr. Fredric Cassidy, an expert in the field of regional English, and the treatises to which he referred show that the word "opry" was in use by the public long before George Hay named the WSM radio show the Grand Ole Opry. As Dr. Cassidy explained, "opry" is a dialectical variation of the word "opera" and was used to refer to various shows with a rural association, *i.e.,* horse opry, medicine opry, and jig opry. According to Dr. Cassidy, in certain regions there is a custom of pronouncing words ending with the letter "a" as if the word ended with the letter "y." Porter Wagoner testified that when he was a boy growing up in West Plains, Missouri, he had heard the word "sofa" pronounced "sofy," and the word "opera" pronounced "opry." This manner of speaking was documented in some detail by Vance Randolph in *Down in the Holler,* a gallery of Ozark folk speech, which was in evidence before the district court. Randolph identified numerous words where there was such language usage. *The Pronunciation of English in the Atlantic States,* by Hans Kurath and Raven I. McDavid, Jr., which was also in evidence, shows a similar manner of speech in the Appalachian regions.

Dr. Cassidy testified that the word "opera" or "opry" as used in jig opry or horse opry was a satirical reference to classical grand opera. That is exactly, as George Hay tells it in his history of the Grand Ole Opry, how Hay came to refer to the WSM radio show as the Grand Ole Opry. In his book, *A Story of the Grand Ole Opry,* Hay tells how he named the radio show. Following an hour of classical music conducted by Dr. Walter Damrosch,

[o]ur control operator gave us the signal which indicated that we were on the air.... We paid our respects to Dr. Damrosch and said on the air something like this: Friends, the programme (sic) which just came to a close was devoted to the classics. Dr. Damrosch told us that it was generally agreed that there is no place in the classics for realism. However, from here on out for the next three hours we will present nothing but realism. It will be down to earth for the

earthy.... For the past hour we have been listening to music taken largely from Grand Opera. But from now on, we will present the Grand Ole Opry.

From the evidence presented, it is clear that WSM did not arbitrarily create the word "opry." Instead it appears WSM chose to call their barndance radio show the Grand Ole Opry to fit the type of entertainment offered. WSM appropriated the word "opry," with its historical roots in country and hill areas similar to the home area of Porter Wagoner, in an effort to communicate the rural, folk nature of the show. The record reveals that this was a conscious effort to receive the benefits of the gloss that the word "opry" would give to the nature of the show. As testified by Minnie Pearl and from WSM's exhibit, *Nashville's Grand Ole Opry* by Jack Hurst, Hay had lived in close contact with the rural mountain people and was aware of their common vernacular. He was familiar with the dialectical variation of "opera" as "opry," and he knew that the rural population to which WSM's radio show was directed would understand what he meant by the term "opry." As Hay explained about the name "Grand Ole Opry," "it seemed to fit our shindig, hoe down, barn dance, or rookus...."

But no matter how much money and effort WSM has poured into promoting its product and what success it has achieved in securing public identification, WSM cannot deprive others of the right to call a product or service by its generic title. *Abercrombie, supra*, 537 F.2d at 9. To avoid unreasonably restraining the public's use of the language, the exclusive appropriation of generic words must be discouraged. The public has an interest in the "natural enrichment of the language [and the prevention of the] 'diminution of the language through private acquisition.'" Folsom and Teply, *Trademarked Generic Words*, 89 Yale L.J. 1323, 1346 n. 110 (1980) (citations omitted).

▮ WSM argues that the district court erred as a matter of law in that it failed to determine the generic nature of "opry" at a relevant time. The district

court not only found that "opry" had been in common use since the eighteenth century, but also found that its generic nature has not changed. In making its finding that "opry" is a generic term the district court appropriately applied the buyer understanding test. There is temporally relevant evidence in the record to support a finding that the current use of the word by the consuming public is of a generic nature. The *Webster's Third New International Dictionary* contains a definition of "opry." The dictionary definition of a word is an appropriate and relevant indication of the ordinary significance and meaning of words to the public. *Zatarains, supra*, 698 F.2d at 792; *American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3, 11 n. 5 (5th Cir.1974). WSM argues that this dictionary evidence is not temporally relevant because *Webster's Third New International Dictionary* bears a 1961 copyright. However, as pointed out by Dr. Cassidy in his deposition, language, although not static, "doesn't change over night." He further stated that

... between 1961 and 1982, it's barely one generation, and the information there should still be of contemporary value. Language doesn't change all that fast. New words come, yes. Old words die out, but it goes by generations.

*The Pronunciation of English in the Atlantic States,* on which the district court also relied in making its finding that "opry" is generic, was also published in 1961. We conclude that there was temporally relevant evidence in the record from which the district court could find that "opry" as currently used by the consuming public is generic.

▮ WSM also argues that the absence of "opry" in other dictionaries refutes the finding that "opry" is generic. A word need not appear in all dictionaries in order to be found generic. Whether a term is generic is determined by actual common usage. *See Miller Brewing Co. v. Heileman Brewing Co.*, 561 F.2d 75, 79–80 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978). Inclusion in

*Webster's* is evidence of the ordinary meaning of the word and indicates at least some degree of usage by the public. There is also evidence in the record that *Webster's* is more comprehensive than other dictionaries and reflects modern usage more than some of the dictionaries in which "opry" did not appear. From such evidence the district court could correctly find that inclusion in *Webster's* was evidence of actual common usage. That evidence plus Hilton's own testimony and the testimony of Dr. Cassidy and the treatises on which he relied constitute substantial evidence to support the court's finding that "opry" is a generic word denoting a country music show.

WSM contends, however, that in attempting to apply the buyer understanding test the district court erred in relying on the testimony of Hilton's expert witness, Dr. Cassidy, and ignored the testimony of WSM's witnesses, all of whom were knowledgeable in the country music industry. According to WSM, Dr. Cassidy's testimony was inadmissible on the issue of the generic nature of "opry" because Dr. Cassidy was not an expert in the field of country music. In ruling on the admissibility of evidence, the trial court has a wide area of discretion and will be overturned only for an abuse of that discretion. *Kontz v. K-Mart Corp.,* 712 F.2d 1302 (8th Cir. 1983). Here we find no abuse of discretion. Although not an expert in the country music field, Dr. Cassidy is an expert in the field of regional English. As such he is qualified to testify concerning the origin of the word "opry," as well as how the word is used by the consuming public.

WSM's contention that the district court did not consider the testimony of WSM's witnesses, which included such Grand Ole Opry stars as Roy Acuff, Minnie Pearl, and Porter Wagoner, is without merit. The court spent the better part of two days listening to their testimony about the Grand Ole Opry. WSM argues that the district court should have given more weight to the plaintiff's witnesses as to the meaning of "opry" to the purchasing public and should have answered the question of buyer understanding in the way testified by these witnesses. The evidence was contradictory and the district court did give controlling significance to the evidence presented by Hilton. However, the question of credibility is peculiarly for the trier of fact. An appellate court will not redetermine the credibility of witnesses, where, as here, the trial court had the opportunity to observe their demeanor and form a conclusion. Fed.R.Civ.P. 52(a); *Dresser Industries, supra,* 395 F.2d at 463.

WSM's witnesses all had close connections with the Grand Ole Opry; three were Grand Ole Opry stars and one was President of WSM. The court has discretion to evaluate the testimony of these witnesses and to give less credit to the testimony of such interested persons. *United States v. Oregon State Medical Society,* 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952). Our study of the transcript leaves us with an impression that the district court could well have concluded that the testimony of these witnesses was so frequently nonresponsive and contained so much affirmatively volunteered, self-serving material that it should be given limited weight. That the district court did not specifically mention the testimony of these witnesses in its findings of fact leaves us with this conclusion rather than a conclusion that it was simply overlooked by the district court, a fact which would not be consistent with the obvious impact of the appearances and testimony of these individuals.[3]

WSM also alleges that in making its finding that "opry" is a generic term, the court relied on evidence not in the rec-

---

3. The court might also have given little weight to WSM's witnesses because of the nature of the buyer understanding test itself. The issue is what the trademark means to the purchasing public; not what it means to those in the industry. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1369 (10th Cir. 1977), *cert. denied,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). The Grand Ole Opry stars are a part of the country music industry, not members of the purchasing public.

ord. At one point during the trial the judge said, "Listen, here's the thing. You can't separate what you know yourself." The statement was made during the course of receiving evidence, and is more a comment that the evidence was consistent with the court's observation, rather than an expression of predisposition or that such statement was itself the basis for the court's conclusion. The abundant findings of fact entered by the district court, and our finding of ample support for these findings in our study of the record, demonstrates that the case was properly decided on the record before the district court.

We conclude that the district court's finding that "opry" is a generic term is not clearly erroneous and affirm the cancellation of the "opry" registration.[4]

## II.

WSM alleges that the district court's finding that Hilton did not infringe its trademark rights is erroneous in that the court failed to consider all of WSM's marks individually and collectively, and that it failed to consider Hilton's intent. WSM also argues that the court's conclusion that there is no likelihood of confusion between Grand Ole Opry and Denny Hilton's Country Shindig Opry Show is inconsistent with its observation that the public associated Ozark Opry with the Grand Ole Opry.

Liability under the Lanham Act for trademark infringement is predicated on the use of a registered trademark that "is likely to cause confusion." 15 U.S.C. § 1114(1)(a). As this Court stated in *Vitek Systems, Inc. v. Abbott Laboratories,* 675 F.2d 190 (8th Cir.1982), the essential question in any case of alleged trademark infringement is whether purchasers are likely to be misled or confused as to the source of the different products or services. The resolution of this issue requires the court to consider numerous factors to determine whether, under all the circumstances, there is a likelihood of confusion. *Vitek, supra,* 675 F.2d at 192. These factors include the

similarity of WSM's marks and Hilton's business title, the intention of Hilton in selecting his business title, the degree of care that is likely to be exercised by the purchasers of the entertainment services, and the existence of actual confusion. *See Squirtco v. Seven Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980). Actual confusion is not essential to a finding of infringement; however, a mere possibility is not enough. There must be a substantial likelihood that the public will be confused. Likelihood of confusion is a finding of fact, and therefore, the district court's finding will be upheld unless it is clearly erroneous. *Vitek, supra,* 675 F.2d at 192.

The district court applied the several factors to the evidence in this case and concluded that Denny Hilton's Country Shindig Opry Show is not likely to be confused with the marks owned by WSM. The district court considered the appearance of Hilton's business title and the marks owned by WSM, as well as the advertising designs used by both Hilton and WSM, and found that there was no substantial similarity between them. As a fair reading of the district court opinion indicates, in comparing Hilton's business title and WSM's marks, the district court expressly considered all of WSM's marks; therefore WSM's allegation to the contrary is without merit.

WSM's contention that the district court did not consider Hilton's intent in resolving the issue of confusion also fails. The district court's determination was based on the application of the above-mentioned factors to the facts of this case, including consideration of Hilton's intent. The court found that Hilton did not add the word "opry" to the name of his show in order to deceive the public that Denny Hilton's Country Shindig Opry Show was affiliated with the Grand Ole Opry or that Grand Ole Opry stars would be performing. There is evidence in the record to support this finding and WSM failed to prove otherwise.

---

4. If a registered mark at any time becomes generic, the Lanham Act, 15 U.S.C. § 1064(c) (1983), provides for the cancellation of that mark's registration.

The district court found that WSM introduced no evidence which showed actual confusion. WSM contends, however, that the court's finding on the issue of confusion is not supported by the evidence and that there is evidence in the record which supports the existence of a likelihood of confusion. After a review of the entire transcript, we conclude that the district court's finding is not clearly erroneous. The findings of the district court demonstrate that the country music audience is a sophisticated one and that the Grand Ole Opry with its panoply of nationally known performing and recording stars would not be confused with other performances that might utilize the commonly used word "opry."

Both parties presented testimony concerning the existence of the likelihood of confusion. In their briefs both WSM and Hilton focus on the testimony of Lee Mace, owner of Ozark Opry and licensee of WSM. Mace testified that although there might be isolated instances in which someone going to Denny Hilton's Country Shindig Opry Show expects to see performers from the Grand Ole Opry, he did not believe that "that is the general case." When asked by the court if anyone would be fooled by the use of the word "opry," Mace answered, "I think there might be isolated incidents, but I don't think it would be a major thing. . . . I think most everybody knows where they are going." As pointed out by WSM, Mace also testified to the possibility of some confusion. WSM presented no witnesses who were actually confused by Hilton's use of "opry." All the testimony on which WSM relies as proof of the existence of a likelihood of confusion is secondhand testimony—persons testifying to the alleged confusion of third parties.

WSM also alleges that the district court finding of no likelihood of confusion is erroneous in that the court failed to consider confusion as to sponsorship or affiliation. While conceding that no one who enters the Denny Hilton Country Shindig Opry in Osage Beach, Missouri, would think he was attending the Grand Ole Opry in Tennessee, WSM argues that there is a likelihood of confusion as to sponsorship or affiliation between Denny Hilton's Country Shindig Opry Show and the Grand Ole Opry. It is clear from the district court opinion that the court considered the possibility of public confusion regarding an association between the Grand Ole Opry and Denny Hilton's Country Shindig Opry Show, and concluded that WSM had failed to present any probative evidence on this point. Our review of the evidence confirms the district court's finding.

Contrary to WSM's contention, the district court's conclusion that there is no likelihood of confusion between Grand Ole Opry and Denny Hilton's Country Shindig Opry Show is not inconsistent with its observation that the public associated Ozark Opry with the Grand Ole Opry. Since Ozark Opry is a licensee of WSM, such an association of the two by the public is logical and is supported by the testimony of Lee Mace, owner of Ozark Opry. There was no such direct, uncontradicted testimony concerning confusion of association between Grand Ole Opry and Denny Hilton's Country Shindig Opry Show.

The district court weighed and evaluated the evidence presented concerning consumer confusion and concluded that there was no likelihood of confusion by the consuming public. On the record before us, we cannot say that this finding is clearly erroneous. On the contrary, the finding of the district court appears to be in conformity with the position taken in the Restatement of Torts:

> The ultimate test of whether or not there is a confusing similarity between a designation and a trademark or tradename which it is alleged to infringe is the effect in the market in which they are used. . . . In any event, the issue is whether an appreciable number of prospective purchasers of the goods or services in connection with which the designation and the trademark or tradename are used are likely to regard them as indicating the same source. That a few particularly undiscerning prospective purchasers might be so misled is not enough.

Restatement of Torts § 728, comment a. The finding of no likelihood of confusion by the district court is adequately supported by the evidence, is not clearly erroneous, and must be affirmed.

## III.

 WSM argues that in making its finding of no unfair competition the district court misconstrued the law. Section 43(a) of the Lanham Act provides that

> [a]ny person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation ... and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any false description or representation.

15 U.S.C. § 1125(a). The purpose of section 43(a) is to create a new federal remedy for the particular kind of unfair competition that results from false designation of origin or other false representation used in connection with the sale of a product. *Metric & MultiStandard Components v. Metric's, Inc.,* 635 F.2d 710, 713 (8th Cir.1980).

WSM is entitled to protection under section 43(a) of the Lanham Act if it can establish that use of its mark by Hilton constitutes a false designation of origin or false representation and that the public is likely to be confused by that use. *Metric, supra,* 635 F.2d at 714; *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 664 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). In determining that Hilton is not engaging in unfair competition by his use of "opry" the district court found that (1) Hilton's use of "opry" in his business title does not con-

stitute a false description or representation, and (2) Hilton's use of the business title "Denny Hilton's Country Shindig Opry Show" is not likely to cause confusion in the minds of the public.

 WSM contends that the district court erred when it stated that since the word "opry" is generic, its use does not amount to a false description or representation. Although the district court's language may have been overbroad,[5] we affirm the finding that Hilton's use of "opry" does not constitute unfair competition on the basis of the district court's determination that there is no likelihood of confusion by the public.[6]

## IV.

 WSM also alleges that the district court erroneously rejected WSM's claim under the Missouri anti-dilution statute, which provides that

> [l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark ... valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Mo.Rev.Stat. § 417.061 (1978). WSM argues that the district court improperly based its rejection of the dilution claim on its finding of no likelihood of confusion in direct contravention to the wording of the statute.

Although we find no reported cases construing the Missouri anti-dilution statute, interpretations of other similar state anti-dilution statutes as well as the basic theory of anti-dilution provide us with a starting point in applying the Missouri statute.

---

**5.** Even a generic mark may be entitled to protection from unfair competition if the mark is "so associated with its goods that the use of the same or similar marks by another company constitutes a representation that its goods came from the same source." *Metric, supra,* 635 F.2d at 714.

**6.** Since the Missouri common law of unfair competition is in accord with federal law, *i.e.,* the right to the exclusive use of a name is

entitled to protection when use by another is likely to cause confusion in the minds of the public, *Missouri Federation of the Blind v. National Federation of the Blind,* 505 S.W.2d 1 (Mo.App.1973); *A.J. Reach Co. v. Simmons Hardware Co.,* 155 Mo.App. 412, 135 S.W. 503 (1911); the district court's denial of WSM's common law claim of unfair competition is also affirmed.

**1332**

Callmann, on whom WSM frequently relies in its brief, in 3 *The Law of Unfair Competition, Trademarks and Monopolies,* (3d ed. Cum.Supp.1982), at pages 954–55, defines dilution as follows:

> The gravamen of a dilution complaint is that the continuing use of a mark similar to the plaintiff's mark will inexorably have an adverse effect upon the value of the plaintiff's mark, and that, if he is powerless to prevent such use, the plaintiff's mark will eventually be deprived of all distinctiveness.... [D]ilution is a cancer which, if allowed to spread, will inevitably destroy the advertising value of the mark.

*See also Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 265 (5th Cir.1980), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980) (interpreting the Georgia anti-dilution statute); *Community Federal Savings & Loan Assoc. v. Orondorff,* 678 F.2d 1034, 1037 (11th Cir.1982) (interpreting the Florida anti-dilution statute).

In *Pignons v. Polaroid Corp.,* 657 F.2d 482 (1st Cir.1981) (interpreting the Massachusetts anti-dilution statute), the court stated that to sustain an action under the anti-dilution statute, plaintiff must show that its mark is distinctive and that the defendant's use of a similar mark has created the likelihood of dilution. 657 F.2d at 493–94. It is the general view that the dilution theory is only applicable if plaintiff's mark is arbitrary, coined, fanciful, or has become distinctive by acquiring a secondary meaning. Callmann, *supra,* at 956 n. 60; *Dilution: Trademark Infringement or Will-O'-the-Wisp?,* 77 Harv.L.Rev. 520, 530 (1964). *Cf. Polaroid Corp. v. Polaraid Inc.,* 319 F.2d 830, 837 (7th Cir.1963) (interpreting the Illinois anti-dilution statute).

The district court found that "opry" is a generic term and that it does not have a distinctive quality outside its generic nature; therefore WSM does not have a valid claim under Mo.Rev.Stat. § 417.061.[7] As we stated, the district court's finding that "opry" is generic in nature is not clearly erroneous. Since "opry" is not an arbitrary, coined or fanciful term, it is not a distinctive mark entitled to protection under the Missouri anti-dilution statute.

WSM argues that even if "opry" is not distinctive alone, marks should be considered in their entireties, and both "Ozark Opry" and "Grand Ole Opry" when considered as a whole, are distinctive. Even if we were to accept WSM's argument, we would still uphold the judgment of the district court on the ground that Hilton's use of "opry" in his business title creates no likelihood of dilution of the distinctive quality of WSM's marks. Our review of the record indicates that Hilton does not use "opry" alone but uses it only in connection with his name, Denny Hilton, and/or his registered trademark, "Country Shindig." The use of a uniquely identifying trade name can be an adequate remedy for dilution. *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201 (1st Cir.1983).

For all the above reasons the judgment of the district court is affirmed.

---

7. Although the district court did refer to its finding of no likelihood of confusion in denying WSM's common law unfair competition claim, the court's rejection of WSM's anti-dilution claim was based on its finding that "opry" is not distinctive.