**ARK PLAS PRODUCTS, INC., Plaintiff,**

v.

**VALUE PLASTICS, INC., Defendant.**

No. 94–3051.

United States District Court,
W.D. Arkansas,
Harrison Division.

Jan. 24, 1996.

Stephen D. Carver, Carver Law Offices, Ltd., Stephen L. Curry, Kemp, Duckett, Hopkins & Spradley, Little Rock, AR, for Plaintiff.

W. Kirby Lockhart, Hargis, Wood & Lockhart, Little Rock, AR, Kay Collins, Luke Santangelo, Santangelo Law Offices, Fort Collins, CO, for Defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiff Ark Plas Products, Inc. ("Ark Plas") has filed this declaratory judgment action against defendant Value Plastics Inc. ("Value Plastics") seeking a declaration of invalidity under the Lanham Act of certain trademarks and trade dress. 15 U.S.C. §§ 1064, 1119. Value Plastics, the claimed owner of these marks and dress, has counterclaimed against Ark Plas for: (1) false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); (2) trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (3) infringement under the laws of various states; and (4) unfair competition under the laws of various states.

Upon careful review of the evidence presented at a three day bench trial conducted from November 14 to November 16 of 1995, the court now makes its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

While basically working in his basement, Kent Sampson designed the first miniature, single-barb, plastic fittings to connect tubing and piping in 1970. This miniature single-barb design reliably conducts fluids and gasses under a broad range of pressures. Mr. Sampson's single-barb design has since become the industry standard for tubing used in medical, technical and scientific applications.[1] Mr. Sampson's company, Value Plastics, has thrived accordingly. The court shall refer to the barb designed in 1970 as the CLASSIC SERIES barb. The CLASSIC SERIES barb appeared on a line of 27 differently shaped fittings called the CLASSIC SERIES.

In 1983, Value Plastics introduced the 200 SERIES barb which was used on the 200 SERIES fitting line. In 1981 Value Plastics began using the phrase INSTRUMENT QUALITY to advertise its fittings, because the fittings were of high enough quality to be used with scientific, medical and technical instruments.

Since approximately 1982, Ark Plas has been a direct competitor of Value Plastics. Rather than struggle through the process of developing its own line of fittings, Ark Plas merely copied 24 out of 27 fittings in the CLASSIC SERIES line. In 1985, Ark Plas copied one fitting from the 200 SERIES and in 1987, it copied five more. In various advertisements, Ark Plas has used the phrase INSTRUMENT QUALITY to describe its goods.

Mr. Sampson quickly became aware of Ark Plas and was somewhat outraged by its piracy, but he decided to do nothing knowing that fifty percent of new businesses usually fail.

In the mid–1980's, Mr. Sampson made a call to the president of Ark Plas, Neuboch Vandermast, and suggested that the market for miniature, plastic, single-barb fittings was too small for two manufacturers of the same product. Mr. Sampson did not make any express claims as to trademark or trade dress infringement.

In the late 1980's, Value Plastics set up the Eldon James Corporation to sell a knock-off brand of Value Plastics fittings that could directly compete with Ark Plas' cheaper, lower-quality product. The purpose of what the parties have called the Eldon James experiment may well have been to run Ark Plas out of the market. At the time, however, Mr. Sampson testified that he did not realize that Ark Plas had a "sugar daddy" in a large company called Micro Plastics and could afford to sustain losses. In any case, the experiment lasted four years and was ended, at which point Value Plastics initiated its litigation strategy by beginning the registration process of its claimed marks and dress with the Patent and Trademark Office ("PTO") in 1991. Registrations issued in January 1993 for the slogan INSTRUMENT QUALITY, in 1994 for the 200 SERIES design, and in 1995 for the CLASSIC SERIES design, although the latter was later cancelled due to an opposition proceeding filed by Ark Plas.

In September 1994, Value Plastics sent Ark Plas a cease and desist letter, which resulted in this litigation. The primary issue in this litigation has to do with the validity of trade dress and trade marks claimed by Value Plastics in the CLASSIC SERIES barb, the 200 SERIES barb, and the slogan INSTRUMENT QUALITY. The court will now consider the burdens of proof that each party has in showing the validity or invalidity of these marks.

## II. BURDEN OF PROOF

### a. Basic Allocation of Burdens

 The person claiming rights in the mark normally has the burden of proving that the designation is inherently distinctive or has acquired secondary meaning and is valid. *Aromatique, Inc. v. Gold Seal, Inc.* 28 F.3d 863, 868–69 (8th Cir.1994). However, registration of a mark on the Principal Register is prima facie evidence of the mark's

---

1. For an illustration of the single-barb design developed by Mr. Sampson, see Exhibit A, which is a page from a Value Plastics catalog.

validity, which shifts the burden of proof on that issue. 15 U.S.C. §§ 1057(b), 1115(a). However, the burden of proof on distinctiveness is shifted only as to inherent distinctiveness or secondary meaning, depending on the basis of registration. *Aromatique*, 28 F.3d at 869–870; *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1326 (8th Cir.1984).

The first trade dress claim concerns the CLASSIC SERIES single-barb fitting, which was registered by the PTO on May 4, 1995, Registration No. 1,817,323. This registration was subsequently cancelled by the PTO as having been inadvertently issued due to a pending opposition proceeding filed by Ark Plas. Therefore, there is no registered trademark in this trade dress and Value Plastics will bear all burdens of proof as to the mark's validity.

The second trade dress claim concerns the 200 SERIES single-barb fitting, which was registered with the PTO on January 25, 1994, Registration No. 1,817,921. As a registered mark, Ark Plas will bear the burden of proof as to invalidity. However, since it was registered on the basis of having secondary meaning, it is only entitled to a presumption that it has acquired its distinction through secondary meaning. Moreover, this presumption attaches only as of the date the mark was registered. *Aromatique*, 28 F.3d at 870.

Value Plastics' sole trademark claim concerns the slogan INSTRUMENT QUALITY as that term is used to market and promote non-metal, single-barb pipe and tube fittings. This mark was registered with the PTO on January 19, 1993, Registration No. 1,747,127. Since the slogan was registered as suggestive and inherently distinctive, Ark Plas has the burden of showing the mark is not inherently distinctive. If Ark Plas succeeds in carrying this burden, then the burden shifts to Value Plastics to prove that the slogan has acquired distinctiveness through secondary meaning.

**b. Fraudulent Procurement**

Ark Plas has attempted to shift the burden of proof as to the 200 SERIES and the slogan INSTRUMENT QUALITY by showing that the registrations with the PTO were fraudulently procured, in which case the PTO registrations would be cancelled pursuant to 15 U.S.C. §§ 1064, 1119. The burden of proving their validity would then shift back to Value Plastics. However, the court does not believe that there is clear and convincing evidence that Value Plastics made any statements to the PTO with an intent to deceive, and so there is no need to shift the above-described burdens of proof.[2]

■ To cancel a mark due to fraudulent procurement, Ark Plas has to show by clear and convincing evidence that: (1) the registrations in question were obtained by means of materially false statements in the application, and (2) that the statements were made with the intent to deceive. *Allen Homes Inc. v. Weersing*, 510 F.2d 360 (8th Cir.), *cert. denied*, 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975); *Gear, Inc. v. L.A. Gear California, Inc.*, 670 F.Supp. 508 (S.D.N.Y. 1987), *op. vac. in part*, 13 U.S.P.Q.2d 1655, 1989 WL 407456 (S.D.N.Y.1989).

■ Ark Plas contends that Value Plastics purposefully made fraudulent statements to the PTO to register the trade dress for the 200 SERIES single-barb fitting. In that proceeding, in 1991, Value Plastics submitted an affidavit stating that it had engaged in "substantially exclusive and continuous use" of the 200 SERIES for at least five years prior to filing the application. On that basis, Value Plastics obtained a presumption of secondary meaning under 15 U.S.C. § 1052(f) and registered the mark.

Ark Plas contends that since Value Plastics clearly knew that Ark Plas was using the 200 SERIES since 1985, the 1991 statements about "substantially exclusive" use were materially false and intended to deceive. Value Plastics responds that Ark Plas had only 1.5% of the relevant market and it believed Ark Plas to be an infringer, so that it believed the statements about "substantially ex-

---

**2.** Ark Plas did not plead fraud with particularity as required by Rule 9(b). *San Juan Prod., Inc. v. San Juan Pools of Kansas, Inc.*, 849 F.2d 468, 472–473 (10th Cir.1988). In fact, fraud was not pleaded at all until the eve of the trial. The court finds, however, that allowing a late amendment of the pleadings did not prejudice Value Plastics, so that the court will allow such amendment to conform to the evidence presented at trial. FED. R.CIV.P. 15(a), (b).

clusive" use to be true and did not intend to deceive the PTO. The court agrees with Value Plastics that Ark Plas has not presented clear and convincing evidence of fraud.

It should be noted that Ark Plas makes the same fraudulent procurement argument with regard to the other registered mark at issue in this case, the slogan INSTRUMENT QUALITY. However, the court reaches the same conclusion as above that Ark Plas has not provided clear and convincing evidence of fraud.

## III. TRADE DRESS CLAIMS

### a. General Principles

■ To be protectable under the Lanham Act, trade dress such as a product design must be nonfunctional. *Two Pesos v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992). In addition, protectable trade dress must either be inherently distinctive, or in the alternative, it must have acquired distinctiveness through secondary meaning. *Two Pesos*, at 769, 112 S.Ct. at 2758. The court will discuss the issues of functionality, inherent distinctiveness, and acquired distinctiveness in turn.

### b. Functionality

■ A product design is functional when it is superior to other available product designs for reasons of cost or quality and thus provides the user with a competitive advantage. *Qualitex Co. v. Jacobson Prods. Co.*, —— U.S. ——, ——, 115 S.Ct. 1300, 1306, 131 L.Ed.2d 248 (1995). Such a product design is costly for competitors to do without and cannot be protected, except under patent law. Conversely, a product design is not functional if there are a number of equally feasible, efficient and competitive designs. RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 17 cmt. b (1993).

■ It is clear from the evidence that the single-barb designs are functional. The taper, tip or radius of the barb is smaller than the inner diameter of the tubing and allows users to easily guide the tubing onto the barb. As the tubing is pushed over the barb, the barb flares out in a cone shape and stretches the tubing. The relationship between the maximum diameter of the cone and the inner diameter of the tubing determines how much the tubing will be stretched. This relationship is called the gradient of expansion. The more flexible the tubing, the greater the gradient of expansion should be. After being stretched over the cone, the tubing drops off into a shank or recess of the barb that allows the tubing to "bite" onto the edge of the cone and create a seal. The shank or recess is cylindrically-shaped and is the size of the tubing's inner diameter, which for engineering reasons, maximizes the tubing's bite on the edge of the cone.

Value Plastics admits that the single-barb design just described is functional, but it contends that there are other, equally feasible and effective single-barb designs that could be used. The court disagrees. While it is true that Ark Plas could have made the tip of its barbs slightly smaller or larger, or it could have made its cone slightly longer or shorter with more or less dramatic gradients of expansion, the fact remains that the same basic underlying design would not be changed. This is especially true when one considers the miniature nature of the product and the fact that small changes in proportion are not likely to be noticeable. Thus, the fact that Ark Plas could have adopted minor variations in design does not mean that there were sufficient alternative designs to render the Value Plastics design nonfunctional. *See* RESTATEMENT § 17 cmt. b ("The range of alternative designs sufficient to preclude a finding of functionality depends on the particular facts of the case.").

In comparison, in *Vaughan Mfg. Co. v. Brikam Int'l, Inc.*, 814 F.2d 346 (7th Cir. 1987), the court upheld the issuance of a preliminary injunction against an alleged infringer where the product in question was a fold-up, portable table and the trade dress in question was a yellow border, a masonite top of a particular color, a black frame and various brass pieces in a particular shape. In this action, the product elements allegedly being infringed are not so visually dramatic and not so clearly nonfunctional as in

*Vaughan.*[3]

### c. Inherent Distinctiveness

■ In addition to being functional, the Value Plastics' product design is not inherently distinctive. Trade dress is inherently distinctive if the design of the trade dress is only "tenuously connected with the nature of the product," and "secondary meaning, which requires a showing that consumers attach significance to the trade dress as a source signifier, need not be proven." *Stuart Hall Co. v. Ampad Corp.,* 51 F.3d 780, 786 (8th Cir.1995). If the design of the trade dress is "dictated by the nature of the product, then secondary meaning must be proven." *Id.*

■ First, it is clear from the evidence that the single-barb designs are not inherently distinctive. As described above, they are not "tenuously connected with the nature of the product," but rather are "dictated by the nature of the product." *Id.* In fact, the trade dress is the product itself. As stated by one commentator, when the trade dress at issue is a product design, rather than product packaging or a container, it is extremely unlikely that it will found to be inherently distinctive. 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 7.23[2] at 7–97 n. 31, 32 (3d ed. 1995). In addition, Value Plastics has not argued that its product design is inherently distinctive and instead has relied on evidence of secondary meaning and acquired distinctiveness. In fact, when Value Plastics registered the CLASSIC SERIES with the PTO, and when it attempted to register the 200 SERIES with the PTO, it relied on the presumption of secondary meaning created by substantial and exclusive use of the mark for at least five years. 15 U.S.C. § 1052(f). When a party registers a mark under the presumption of secondary meaning, the trade dress is not inherently distinctive as a matter of law. *Aromatique,* 28 F.3d at 869.

### d. Acquired Distinctiveness

It is clear from the evidence that the single-barb designs at issue have not acquired

distinctiveness through secondary meaning, *i.e.,* a significant number of purchasers do not understand the trade dress as indicating a particular source. RESTATEMENT § 13 cmt. e. This is especially true when one considers that a consumer would have to be able to identify the miniature Value Plastics' barb design in contrast with an essentially similar Ark Plas design, albeit one with slightly different proportions.

■ Secondary meaning may be established by direct evidence of the link between the mark and the source in the form of (1) consumer testimony, (2) customer surveys, and (3) proof of actual confusion. *Aromatique,* 28 F.3d at 871. Secondary meaning may also be established by circumstantial evidence of the connection between the mark and source, *i.e.,* evidence relating to the nature and extent of public exposure, such as (1) volume of sales under the mark, (2) length of time the mark has been in use, (3) advertising and other promotional efforts if they prominently use the mark and invite consumers to "look for" the designation when selecting goods; and (4) the physical manner of display if prominent. *Id.* Finally, proof that a competing seller has intentionally copied a designation can create an inference of secondary meaning. *Id.*

■ The evidence in the present case is as follows. First, Value Plastics often resold its fittings through catalog resellers. This is important evidence, even though resales only amounted to 10% of Value Plastics' $30 million in total sales, because Value Plastics allowed the resellers to identify themselves as the source of the part. For instance, Duane Lorenz, a buyer for Parker Hannifan, which purchased and resold Value Plastics fittings, testified that Parker Hannifan wanted its customers to believe that it was the manufacturer of the Value Plastics fittings. Otherwise, the consumer might just buy direct from Value Plastics or might limit the ability of Parker Hannifan to switch suppliers at some later date. Before making his decision to use Value Plastics as a supplier of

---

**3.** The parties generated a great deal of post-litigation engineering evidence as to functionality, but the court did not find this evidence to be particularly probative and each party's expert evidence cancelled out the other's.

miniature plastic single-barb fittings, Lorenz researched the entire market, which was comprised of Value Plastics and Ark Plas. He did not seem to have any trouble distinguishing the two, nor did any of his major purchasers who often insisted on Value Plastics parts. As Value Plastics points out, distribution of a product through resellers does not always bar a trade dress claim if the product being resold is still identified with a single anonymous source. However, the anonymous source rule does not apply to this case because the resellers wanted to be identified as the source of the Value Plastics fittings, and not some other anonymous source. *Cf. Tone Bros., Inc. v. Sysco Corp.,* 28 F.3d 1192 (Fed.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1994).

Second, customer testimony indicates that customers cannot make small distinctions among barb designs. Larry Blake, a professional engineer who consults as to medical equipment and who used to be a loyal Value Plastics customer ten years ago, could not say what made Value Plastics' barb distinctive. He referred to the "geometry" or "spirit" of a Value Plastics barb. He referred to the "proportion of different diameters and lengths and tapers and so on."

When Value Plastics introduced the 200 SERIES with its modifications of the barb, Blake "vaguely remembers" that he was told about the new product and "something new about something," but he is not sure that he "even noticed" the change although he thinks there was "something different" or some "subtle changes."

Finally, Blake was shown catalogs from Parker Hannifan, Craftech Industries, and Upchurch Scientific that resold Value Plastics fittings but did not identify them as such. After looking at the catalog pictures of the fittings, Blake himself said he did not know who made them, and agreed that it was reasonable to assume that they had in fact been made by Parker Hannifan, Craftech Industries, and Upchurch Scientific.

Third, there is no proof of actual confusion at the point of sale. All the advertisements of Ark Plas have the distinctive Ark Plas logo prominently displayed. Highly experienced buyers, such as Duane Lorenz, were likely to do significant market research and would be aware that there were two companies. It also makes sense that less experienced buyers would simply rely on the logos and company names rather than the Computer Assisted Drafting (CAD) drawings of the barb. There was some evidence that some consumers would send Ark Plas parts to Value Plastics when they failed, tending, perhaps, to show confusion over source, but such confusion probably cannot be avoided. Value Plastics is the dominant player in the industry with an over 90% market share. Once taken out of their packaging, a less experienced consumer has no way of knowing where the part comes from. Even if the Ark Plas logo were on the product itself, the products are so tiny that they are not likely to be noticed. A more experienced buyer can tell an Ark Plas part from a Value Plastics part because the Ark Plas part has flashing, a cruder finish, and inconsistent color.

With regard to circumstantial evidence of secondary meaning, the evidence indicates that Value Plastics has spent $700,000 on advertising its single-barb fittings and has achieved $30 million in sales. With regard to advertising, there is no break down on how much was spent when, or how much was spent advertising each series of fittings. More important, there is no break down as to how much was spent to create secondary meaning specifically in the design of the barb. The advertisements submitted to the court put as much emphasis on the Value Plastics logo, and on the CAD drawings of the T-shape or elbow-shape of the fitting flange, as it did on the CAD drawings of the barb tip. *See Aromatique,* 28 F.3d at 871 ("advertisements ... cannot establish secondary meaning because they do not separate the claimed dress of the products from the other marks that serve to identify the products" as those of a particular source). Also, the advertisements contain no language telling the consumer to look for the distinctive Value Plastics barb. The court finds the evidence of $700,000 total advertising and promotion not persuasive as establishing secondary meaning. *See Aromatique,* 28 F.3d at 872 (party claiming mark spent $562,000

on advertising, but that included costs of travel to marketing shows and remaining $250,000 was "probably too low to accord it much probative value"). Under these circumstances, the court finds no evidence of secondary meaning through sales and advertising.

Value Plastics has made much of the fact that Ark Plas entered the field of competition by copying the Value Plastics barb and 24 of 27 fitting shapes, such as the T-shape and the elbow-shape, and that the existence of secondary meaning may be inferred from that copying. While Ark Plas denies it copied the Value Plastics line and contends that it developed its product line independently, this denial is simply not credible to the court.

However, that does not mean that this copying provides sufficient evidence of secondary meaning. While the existence of secondary meaning may be inferred from evidence of deliberate copying of a mark, a contrary inference may nevertheless be drawn once other evidence has been considered. *Aromatique,* 28 F.3d at 871. More to the point, where there is a demand for a type of product, capitalizing on that demand by copying that product does not necessarily indicate that the original product has secondary meaning. *Id.*

The court does not consider Ark Plas' deliberate copying to be indicative of secondary meaning. The court finds that Ark Plas was not copying the Value Plastics line to make consumers think it was Value Plastics or to steal the good will of Value Plastics. Rather, Ark Plas was trying to enter a market "monopolized" by Value Plastics by making a cheaper, lower-quality product, and by saving entry costs by copying Value Plastics' product line. This may not seem fair, but it is not necessarily prohibited by law.

Finally, there is Value Plastics' evidence of completely exclusive and continuous use of the its CLASSIC SERIES barb from at least 1970 to 1982 when Ark Plas first copied the barb. Also, there is Value Plastics' evidence of completely exclusive and continuous use of its 200 SERIES barb from at least 1983 to 1985 or 1987 when Ark Plas copied that barb as well. However, the court does not consider this to be strong evidence of secondary

meaning, especially given the fact that Value Plastics waited from approximately 1983, when it first found out what Ark Plas was doing and was outraged, until 1991 to file a trademark registration, and until 1994 before sending a cease and desist letter and initiating litigation. Under the totality of the evidence, the court finds that there is no secondary meaning in the trade dress, and it is not entitled to trademark protection.

## IV. TRADEMARK CLAIMS

To be a valid trademark, a phrase, like trade dress, must be "inherently distinctive," or in the alternative, it must have acquired distinctiveness through "secondary meaning." *Two Pesos,* 505 U.S. at 769, 112 S.Ct. at 2758 (citing RESTATEMENT (THIRD) UNFAIR COMPETITION, 13 (Tent. Draft No. 2 (1990)). Whether this mark is either inherently distinctive or has acquired secondary meaning will be dealt with in turn.

### a. Inherent distinctiveness

Whether a phrase is inherently distinctive is determined by classifying the mark as either (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary or fanciful. *WSM,* 724 F.2d at 1325. Suggestive, arbitrary, or fanciful marks are inherently distinctive and entitled to protection, while generic and descriptive ones are not distinctive and are not entitled to protection, absent a showing of secondary meaning. *Id.* However, "[t]hese categories are like colors in a spectrum, and tend to blur at the edges and merge together." *Id.* The correct categorization of a given phrase is a question of fact. *Anheuser–Busch Inc. v. Stroh Brewery Co.,* 750 F.2d 631, 635 (8th Cir.1984).

At trial, Ark Plas contended that the slogan INSTRUMENT QUALITY is a descriptive phrase and not inherently distinctive. Descriptive phrases are those that convey information concerning an ingredient, quality, characteristic, function or use of the goods. *Stuart Hall, supra.*

Value Plastics contended that the phrase is suggestive and is inherently distinctive. Suggestive marks are those that

suggest but do not describe qualities and characteristics of the product. Where the consumer must exercise imagination to connect the qualities of the product to the qualities described by the mark, the mark is suggestive. *Anheuser–Busch,* 750 F.2d at 635.

■ The following evidence showed that INSTRUMENT QUALITY is a descriptive mark. First, the phrase INSTRUMENT QUALITY is descriptive in a common sense way. It indicates that a product is of such high quality that it can be used with instruments, generally of a technical or laboratory nature.

Second, Value Plastics uses the phrase for descriptive purposes. The 1994–95 Value Plastics product catalog spends six paragraphs answering the question "WHAT DOES INSTRUMENT QUALITY MEAN?" The answer is that the phrase indicates the presence of certain attributes that any fitting may have. For instance, whether a fitting is "instrument quality" depends on the placement of the parting lines and the type of manufacturing process used. In its catalogs, Value Plastics even acknowledges that other fittings manufacturers may use the phrase to describe the attributes of their own fittings, but insists that the use of the descriptive phrase would not be accurate.

Other companies may tell you that their fittings are "Instrument Quality" when in truth they are not.

*See* Value Plastics Catalog, 1994–95.

Third, the phrase INSTRUMENT QUALITY appears to be used descriptively in the technical community, as evidenced by two patents that describe the patented technical product as being of "instrument quality" or "instrumentation quality." Also, the phrase is used descriptively in advertisements to describe flow switches.

Fourth, Kent Sampson and his daughter created the Eldon James Corp. to market a cheaper, lower-quality brand of fitting, and this company used the phrase INSTRUMENT QUALITY in marketing its own single-barb fittings. Value Plastics contends that this usage is not relevant to whether the phrase is descriptive, as the usage was li-censed. However, whether the usage was licensed is beside the point. The point is that the phrase was used by the Eldon James Corp. to describe its fittings, not to indicate Value Plastics as the source, even though Value Plastics was the actual source of the fittings being sold. In fact, the parties were clearly striving to keep the source secret since Eldon James Corp. was selling lower quality, "knock off" versions of the regular Value Plastics product. Despite the extremely strong desire to hide Value Plastics as the true source of the fittings, Eldon James Corp. still used the phrase INSTRUMENT QUALITY to describe its product.

Taken together, this evidence shows that the phrase INSTRUMENT QUALITY is descriptive. This conclusion is in line with other illustrative cases dealing with slogans. *See e.g. Norm Thompson Outfitters, Inc. v. General Motors Corp.,* 448 F.2d 1293 (9th Cir.1971) (ESCAPE FROM THE ORDINARY for clothing held descriptive and lacking secondary meaning); *Roux Laboratories, Inc. v. Clairol, Inc.,* 427 F.2d 823 (C.C.P.A. 1970) (HAIR COLOR SO NATURAL ONLY HER HAIRDRESSER KNOWS FOR SURE held descriptive of hair coloring but secondary meaning established); *cf. In re Marriott Corp.,* 517 F.2d 1364 (C.C.P.A.1975) (WE SMILE MORE for hotel services held suggestive); *In re Wilderness Group, Inc.,* 189 U.S.P.Q. 44 (Tm.Tr.App.Bd.1975) (LET YOUR HIPS SHOULDER THE LOAD on hiking equipment held suggestive). The above cases are only illustrative. Whether a phrase is suggestive or arbitrary is question of fact in each particular case. *Anheuser–Busch,* 750 F.2d at 635.

#### b. Secondary meaning

At trial, Value Plastics attempted to show that, even if the phrase is descriptive and not "inherently distinctive," it has acquired distinctiveness through secondary meaning.

■ As stated above, secondary meaning exists only if a significant number of prospective purchasers understand the term, when used in connection with a particular kind of good, service, or business, not merely in its lexicographic sense, but also as an indication of association with a particular entity. RE-

STATEMENT (THIRD) UNFAIR COMPETITION § 13 cmt. a.

However, there is no evidence supporting Value Plastics contention that the phrase has acquired secondary meaning. The only evidence in the record is that Value Plastics used the mark continuously since 1986, but that is not sufficient in and of itself, given the strong evidence of descriptiveness described above.

## V. STATE LAW CLAIMS

Value Plastics has filed various counterclaims for trademark infringement and unfair competition under the laws of at least seven states where it holds trademark registrations. However, the parties have devoted no argument to these causes of action and have not briefed them, so that it would not be justified for the court to address them. Due to these circumstances, the court now dismisses the state law claims without prejudice, refusing to exercise supplemental jurisdiction over the state law claims. 28 U.S.C. §§ 1338, 1367; *see Conopco, Inc. v. May Dept. Stores Co.*, 46 F.3d 1556, 1571 (Fed.Cir. 1994) (upholding the district court which "declined to exercise pendent jurisdiction because Conopco's state law claims were brought pursuant not only to Missouri law but to the common law of every other state"), *cert. denied,* —— U.S. ——, 115 S.Ct. 1724, 131 L.Ed.2d 582 (1995).

## VI. EQUITABLE DEFENSES

Ark Plas has raised the equitable defenses of laches and unclean hands in defense to the federal and state counterclaim actions. Since the court has dismissed the state law claims and found that the Value Plastics cannot prevail on its federal counterclaims for (1) false designation of origin, 15 U.S.C. § 1125(a); and (2) trademark infringement, 15 U.S.C. § 1114, there is no need to consider Ark Plas' equitable defenses.

## VII. CONCLUSION

In summary, the court finds that the CLASSIC SERIES barb design (Application No. 74/394,523), the 200 SERIES barb design (Registration No. 1,817,921), and the

slogan INSTRUMENT QUALITY (Registration No. 1,747,127) are not valid trademarks and are not entitled to protection under any provision of the federal trademark laws.

### *JUDGMENT*

On this 24th day of January 1996, Upon careful review of the evidence presented at a three day bench trial conducted from November 14 to November 16 of 1995, the court finds, for reasons stated in the memorandum opinion of even date, that judgment shall be for plaintiff Ark Plas Products Inc.

It is hereby declared that the CLASSIC SERIES barb design (Application No. 74/394,523), the 200 SERIES barb design (Registration No. 1,817,921), and the slogan INSTRUMENT QUALITY (Registration No. 1,747,127) are not valid trademarks and are not entitled to protection under any provision of the federal trademark laws. This case is hereby dismissed.

IT IS SO ORDERED.