## COMMITTEE FOR IDAHO'S HIGH DESERT, Plaintiff,

v.

## James A. YOST, Ted Hoffman and Quey Johns, doing business as "The Committee for Idaho's High Desert, Inc.," Defendants.

### No. CV 94–0089–S–LMB.

United States District Court, D. Idaho.

April 6, 1995.

David Z. Nevin, Nevin Kofoed & Herzfeld, Laird J. Lucas, Land & Water Fund of the Rockies, Boise, ID, for plaintiff.

Gary D. Babbitt, Hawley Troxell Ennis & Hawley, Boise, ID, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, MEMORANDUM DECISION AND ORDER

BOYLE, United States Magistrate Judge.

## I.

## INTRODUCTION

Plaintiff brought this action against Defendants, seeking permanent injunctive relief under the Lanham Act, 15 U.S.C. § 1051, *et seq.* In this action, Plaintiff alleges that Defendants deliberately infringed its trademark or trade name "Committee for Idaho's High Desert" (hereinafter "CIHD") in order to defeat and harm Plaintiff in pursuing its environmental protection activities.

Trial commenced on January 24, 1995 and was heard by the Court sitting without a jury. Plaintiff was represented by Laird J. Lucas and David Z. Nevin, and Defendants were represented by Gary D. Babbitt. At trial, the parties introduced oral and documentary evidence that the Court has carefully and thoroughly considered. Therefore, being fully advised in the premises, the Court enters the following findings of fact, conclusions of law, memorandum decision and order.

## II.

### PROCEDURAL HISTORY

Plaintiff Committee for Idaho's High Desert (hereinafter "Plaintiff") filed the instant action on March 1, 1994 against Jim Yost, Ted Hoffman, Quey Johns, and Committee for Idaho's High Desert, Inc. (hereinafter "Defendant corporation") alleging claims of trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and under Idaho statutory and common law, as a result of Defendants' incorporation and use of the name "Committee for Idaho's High Desert." Plaintiff's complaint demanded a jury trial, and prayed for injunctive relief, damages, and other relief.

Defendants filed a Motion to Dismiss and/or in the Alternative for Summary Judgment on March 17, 1994 (Docket No. 2). Following briefing by both parties on this motion, an Order Denying Motion to Dismiss was issued by the Hon. Harold L. Ryan, United States District Judge, to whom this case was originally assigned, denying the motion without prejudice and granting Plaintiff leave to file an amended complaint (Docket No. 11). Plaintiff's First Amended Complaint was filed on June 24, 1994 (Docket No. 12). Defendants filed their Answer on August 3, 1994 (Docket No. 16).

All parties consented to reassignment of the instant action to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). On July 8, 1994, this action was reassigned to the undersigned.

On September 28, 1994, Defendants filed a Motion for Partial Summary Judgment (Docket No. 29), and on October 24, 1994 Defendants filed another Motion for Summary Judgment (Docket No. 40). By Order dated December 13, 1994, which is incorporated herein by reference, the Court granted in part and denied in part Defendants' motions for summary judgment, dismissing all claims against the individual Defendants and as to all state law claims, but ordering a bench trial for the remaining federal Lanham Act claims which seek injunctive relief.

A four-day bench trial was commenced on January 24, 1995 on Plaintiff's Lanham Act claims, in which the Court considered extensive testimony and documentary evidence. Having carefully considered the testimony and evidence presented at trial, having thoroughly reviewed all of the exhibits admitted into evidence, and having considered arguments and briefs of counsel, the Court hereby makes the following Findings of Fact pursuant to Fed.R.Civ.P. 52(a).

## III.

### FINDINGS OF FACT

To the extent that any conclusions of law contained in Part IV of this order can be considered to be, or are deemed to be, findings of fact, they are incorporated by reference into these findings of fact.

#### A. *The Parties*

1. Plaintiff Committee for Idaho's High Desert is a non-profit environmentalist membership organization concerned with a wide variety of activities which include public education, influencing public policy on public lands issues such as cattle grazing and range land reform, water use, recreational use, endangered species issues, the proposed Air Force training range near Mountain Home, Idaho, wilderness designation, and other natural resource issues affecting the desert regions of southwest Idaho, but also to those desert areas reaching into Nevada, Oregon, and Utah.

2. Plaintiff is comprised of a voluntary group of individuals who have formed and joined together over the years for the purpose of prosecuting the aforesaid common interest enterprise.

3. Plaintiff's goal in dealing with these issues is to encourage limited use of public lands with an emphasis on conservation and preservation of the natural state of the desert ecosystem.

4. Plaintiff organized and began conducting business as a non-profit environmental membership organization under the name "Committee for Idaho's High Desert" as early as the late 1970's, led originally by Bruce Boccard and has conducted such activity and business continuously until the time of trial.

5. Plaintiff incorporated under the name "Committee for Idaho's High Desert, Inc." in 1981, but thereafter forfeited its corporate charter in 1985 for failing to file an annual reporting form with the Idaho Secretary of State. Since that time, Plaintiff has operated under the mistaken assumption that it was a corporation in good standing, until it discovered the forfeiture during the Bruneau snail de-listing litigation which will be discussed below.

6. Although Plaintiff believed it was operating as a corporation, it often did so only informally, due to the voluntary, changing, and diverse nature of its membership, the absence of anyone in the organization familiar with proper corporate procedure, and the absence of employment of an attorney.

7. On September 14, 1993, Defendant corporation was incorporated in the State of Idaho under the name "Committee for Idaho's High Desert, Inc." by the three individually named Defendants, James Yost, Ted Hoffman, and Quey Johns, who are its officers, directors, and only members.

8. Until December 16, 1994, James Yost was the Director of Public Affairs of Idaho Farm Bureau ("IFB") which has been an opponent of CIHD in the public debate over the use of Idaho's public lands.

9. Ted Hoffman was the president of Owyhee Cattlemen's Association ("OCA") which has usually been an opponent of CIHD in the public debate over the use of Idaho's public lands. Hoffman's approach to this debate and convictions as to how it should be resolved also differ from CIHD's approach.

10. Quey Johns is the president of Owyhee Farm Bureau ("OFB") and a member of IFB, both of which organizations have been opponents of CIHD in the public debate over the use of Idaho's public lands.

11. Defendant corporation is a non-profit corporation concerned with influencing public policy on the same issues with which Plaintiff is concerned, except its goals and those of its incorporators, the individual named Defendants herein, emphasize maximization of use of public lands for traditional agricultural interests such as farming and ranching. These differing views have made the parties to this action adversaries in the public debate over the use of public lands in Idaho.

## B. *Background Facts and Events*

12. In 1992, Plaintiff and another environmental group, Idaho Conservation League ("ICL"), brought an action against the federal government to require listing of the Bruneau snail as an endangered species. *Idaho Conservation League, et al. v. Lujan,* Case No. CV 92–0260–S–HLR (D.Idaho 1992). The Bruneau snail was listed as an endangered species in January, 1993 as a result of this referenced litigation.

13. Various agriculture and cattle organizations, including the IFB, OFB, and OCA with whom Defendants were occasionally associated, joined together to form an organization called the "Bruneau Valley Coalition" ("BVC") which subsequently filed a new federal action seeking to have the Bruneau snail "de-listed" as an endangered species. *Idaho Farm Bureau et al. v. Babbitt,* 839 F.Supp. 739 (D.Idaho 1993).

14. Plaintiff moved to intervene in that suit on September 1, 1993 in order to defend the listing of the Bruneau snail as an endangered species.

15. Shortly after Plaintiff moved to intervene in the snail de-listing litigation, an associate of Defendant James Yost at the Idaho Farm Bureau went to the Idaho Secretary of State's office at the direction of Mr. Yost to check whether Plaintiff and the ICL, against whom they were involved in the snail litigation, were corporations in good standing in Idaho.

16. Having learned that Plaintiff had forfeited its corporate charter in 1985, and without informing Plaintiff of its forfeiture, Defendants immediately, within twenty-four hours of learning of Plaintiff's corporate forfeiture, incorporated the Defendant corporation under the name "Committee for Idaho's High Desert, Inc."

17. Defendants and the BVC then sought to prevent Plaintiff's intervention in the Bruneau snail de-listing litigation on the basis that Plaintiff had no capacity to participate in the action because it had forfeited its corporate charter in 1985.

18. Plaintiff first learned of its corporate status and forfeiture when it was brought to the court's attention in the snail de-listing litigation as part of the attempt to prevent Plaintiff's intervention. Plaintiff thereupon promptly sought reinstatement with the Secretary of State for the State of Idaho but was informed that Defendants had incorporated under Plaintiff's exact name. Plaintiff was therefore prevented from reinstatement as a corporation under its accustomed name it had used since at least 1980.

## C. *Existence of Protectable Trademark or Trade Name*

19. Plaintiff did not register its name or mark on the principal or supplemental registers pursuant to 15 U.S.C. §§ 1051 or 1091.

20. Plaintiff provides informational and educational services to its members and to members of the public interested in environmental issues involving the desert regions in parts of Idaho, Oregon, Nevada, and Utah. These services and activities include but are not limited to dissemination of information regarding environmental issues through the news media, through its newsletters called "Desert Notes," and through its "alerts"; advocacy on its members' and the interested public's behalf in favor of an environmental agenda focusing on preservation or conservation of the desert ecosystem through such avenues as testimony at public hearings on use of public resources, providing written and oral comments that have at times even been solicited by the Bureau of Land Management on environmental impact statements to be submitted to Congress for designation of wilderness areas, providing proposals to federal agencies for wilderness designation, meeting and corresponding via U.S. mail with public officials, and attending various "environmental" meetings held in various states and in Washington D.C.; presentation of informative and educational slide shows, seminars, and lectures to the public and at schools; conducting hikes for the public and its members into the Owyhee and Bruneau desert regions; and conducting various fund-raising events.

21. Plaintiff also provides certain goods to its members in return for membership fees, such as newsletters, and printed "alerts." Plaintiff also sells goods to its members and the public, particularly when sponsoring or otherwise participating in "Desert Conferences" with other environmental organizations held in Idaho or in other nearby states. These goods include bandannas, T-shirts, and bumper stickers.

22. Plaintiff has consistently and continuously used its name "Committee for Idaho's High Desert" in providing these goods and services, whether directly affixed to the goods or expressed in providing services, or in otherwise conducting business since at least 1980 through the date of trial.

### 1. *Geographically Descriptive Nature of the Name*

23. The phrase "Idaho's high desert" is geographically descriptive, although not of any universally understood area with defined boundaries, but of the general area of the desert regions in Idaho, mostly the deserts of southwest Idaho, but also stretching into the Snake River plains and north toward Salmon, Idaho.

24. However, Plaintiff's name is *"Committee for Idaho's High Desert,"* and the Court finds that the addition of these terms renders Plaintiff's name not merely geographically descriptive.

### 2. *Secondary Meaning*

25. The evidence produced at trial sufficiently establishes that the relevant "consumer" group, Plaintiff's members and potential members, public officials and agencies involved in making policy decisions on these lands, conservationist groups and individuals, and other members of the interested public, has come to associate the name "Committee for Idaho's High Desert" and "CIHD" with Plaintiff, and not simply the goods and services it provides, and that the name denotes a single thing coming from a single source.

26. Plaintiff has conducted a significant amount of advertising of its name and business activities through public television, radio, newsletters, public hearings, and various meetings, lectures, hikes, school presenta-

tions and slide shows, much of which have extended outside of Idaho.

27.  Plaintiff's continuous use of the name "Committee for Idaho's High Desert" in conducting its business, whether directly affixed to the goods, expressed in the provision of the services, or in otherwise conducting its business, has been exclusive since at least 1980, until Defendants incorporated under that name on September 14, 1993.

28.  As a result of Plaintiff's continuous and exclusive use of its name in conducting its business since 1980, Plaintiff has gained substantial notoriety, influence, and prominence in the public debate over the use of public lands, natural resources in the desert areas of southern Idaho and the surrounding desert regions, particularly on the issues of wilderness and scenic river designation, and the Mountain Home Air Force Base training range dispute.

### 3.  *Likelihood of Confusion*

■ 29.  Although the name "Committee for Idaho's High Desert" is not inherently strong, as is an arbitrary or fanciful name, it has come to be quite strongly associated with Plaintiff and its activities through extensive public exposure through the press, media, and particularly its impact on public officials resulting from Plaintiff's participation in public land management debates in which Plaintiff has become very prominent.  In all these activities Plaintiff has continuously and extensively used the name "Committee for Idaho's High Desert".

30.  Defendants' use of the name "Committee for Idaho's High Desert" is closely related to Plaintiff's use of the name and the services it provides.  Although Plaintiff's and Defendants' purposes lead them to viewpoints that are virtually antithetical, their relevant circle of "consumers" is similar— people interested in environmental issues on public policy affecting the natural resources of Idaho's desert regions, and public officials involved in making those public policy decisions.

31.  Furthermore, both parties' methods of communicating and achieving their purposes are similar, i.e., they both use the press and media, particularly in southwest Idaho, and both attempt to influence the same public officials and agencies on the same issues at public hearings and agency hearings on such land use issues.

32.  The name adopted and used by Defendant corporation is identical to Plaintiff's name "Committee for Idaho's High Desert," with the possible exception that Defendant added "Inc.," although Defendants have used the name publicly without the "Inc."

33.  The evidence further establishes that Defendants' use of the name "Committee for Idaho's High Desert" actually confused certain members of the media and the relevant consuming public concerning the true identity of CIHD.

34.  Defendants knew of Plaintiff and its exclusive use of the name "Committee for Idaho's High Desert" for several years prior to Defendants' adoption of the same name, including knowledge of Plaintiff's active involvement and participation in the Bruneau snail de-listing litigation.

35.  The public debates over the proper use of desert resources particularly in southwestern Idaho have been very heated and controversial, with Plaintiff and Defendants invariably at odds with each other.  Mr. Hoffman publicly expressed strong differences and what could be perceived as hostility towards Plaintiff's positions on these natural resource issues with which both Plaintiff and Defendants are concerned, by characterizing Randy Morris, Plaintiff's long standing chairman, and Plaintiff as employing "enviro-nazi tactics" and "environmentalist flim-flam" in a letter to the editor of a local newspaper approximately three months before he and the other Defendants incorporated the Defendant corporation.

36.  For one to three years prior to incorporating Defendant corporation, Defendants discussed and considered the possibility of forming a new organization to confront natural resource issues affecting Idaho's public lands.  Defendants had not formed this group earlier because they were too busy.  However, despite Defendants' previous inability to bring into fruition this organization which they had discussed for several years,

they quickly made the decision to form and incorporate Defendant corporation within twenty-four hours of the time Defendants learned that Plaintiff had forfeited its corporate status, and during their active involvement in the snail de-listing litigation.

37. Defendants discussed using "Committee for Idaho's High Desert" as the name for their new organization during the one to three year period prior to the formation of Defendant corporation. Although Defendants claimed to have liked the name because it suited their group well, Mr. Hoffman admitted that they could have chosen many different names to describe their organization. Indeed, Defendants had actually discussed a number of particular names completely different from "Committee for Idaho's High Desert." Defendants did not seriously consider utilizing "Committee for Idaho's High Desert" as a potential name because they knew Plaintiff was using that name. However, Mr. Yost testified that once he found out that Plaintiff had forfeited its corporate charter, he liked Plaintiff's name as a potential for Defendants' new organization more than before.

38. Mr. Yost testified that he and the other Defendants learned that Plaintiff had forfeited its corporate status, almost immediately after which they formed Defendant corporation, because he and others from BVC had conducted a thorough investigation of Plaintiff's and the ICL's ability to participate in the Bruneau snail de-listing litigation, and that they did so because they wanted to prevail in that litigation.

39. At a public hearing in January, 1994 conducted by the U.S. Air Force concerning a proposal to develop an air force training range on federal and state lands in southern Idaho and northern Nevada, Mr. Hoffman stated that he was president of the Committee for Idaho's High Desert which was supportive of the proposal, a position he knew to be diametrically and publicly opposed by Plaintiff. Mr. Hoffman acknowledged that he made this statement to add to his credibility as an environmentalist to support the training range proposal.

40. In February, 1994, Mr. Hoffman also identified himself at an annual meeting of the OCA as president of Committee for Idaho's High Desert, an organization which he knew had received wide coverage in the press in the Owyhee region, and described the new group.

41. Although Defendants asserted at trial that the purpose of the formation of Defendant corporation was to create a group concerned with natural resources issues on Idaho's public lands which would be unaffiliated with traditional agricultural interest groups with which they were associated at the time, the principal place of business listed on Defendant corporation's articles of incorporation is the Boise, Idaho office of Idaho Farm Bureau.

42. The BVC, which comprised the plaintiffs in the Bruneau snail de-listing litigation, with whom Defendants were variously affiliated, and which organization was involved in conducting the thorough investigation of Plaintiff's ability to participate in the Bruneau snail de-listing litigation, incorporated on the same day as Defendant corporation and within minutes of each other. The type face of BVC's articles of incorporation and the "footers" appearing on the bottom of the pages, are the same or similar to those appearing on Defendant corporation's articles of incorporation.

43. The evidence further establishes that Defendants intended to and actually did use Plaintiff's articles of incorporation and by-laws as a model for Defendant corporation's articles and by-laws, and copied virtually verbatim Plaintiff's statement of purposes from its articles of incorporation in Defendant corporation's statement of purposes except for making a few minor, subtle changes where necessary to represent what are distinct differences between their and Plaintiff's environmental philosophies.

44. Defendant corporation was initially capitalized with only $120, has no present assets except a bank account balance of approximately $70, and has conducted no actual business as a corporation.

45. In light of the foregoing evidence, and having thoroughly reviewed all the documentary evidence and testimony, and having carefully considered the demeanor of the wit-

nesses and credibility of their testimony, the Court finds that Defendants knowingly, intentionally and deliberately adopted and used Plaintiff's name "Committee for Idaho's High Desert" in order to cause confusion, obstruct Plaintiff's pursuit of its environmental agenda, and thereby to obtain an advantage in the snail de-listing litigation by preventing Plaintiff's intervention therein.

46. The evidence establishes that in the event Defendants prevail in the instant action, they intend to expand their activities to compete against groups similar to Plaintiff. In that event, Defendants intend to solicit more members, generate more funding, seek state and federal grants, and comment to public agencies and elected officials on public policy issues affecting public lands in Idaho in accordance with their public lands philosophical agenda.

47. The Court finds that such activities and positions adopted by Defendant corporation under the name "Committee for Idaho's High Desert" are likely to cause continuing confusion among the relevant consuming public.

### IV.

### CONCLUSION OF LAW

To the extent any findings of fact are deemed to be conclusions of law, they are incorporated by reference into these conclusions of law.

48. The instant action was brought under the Lanham Act, 15 U.S.C. § 1051, *et seq.*

49. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338.

#### A. *Plaintiff's Capacity to Bring Suit*

■ 50. Throughout this litigation, Defendants have asserted that Plaintiff does not have capacity to bring the instant action, due to the fact that Plaintiff corporation forfeited its corporate charter in 1985 and since that time has failed to reinstate itself as a corporation in good standing in the State of Idaho.

51. It is well settled, however, that under Fed.R.Civ.P. 17(b)(1), any incapacity Plaintiff may have under Idaho law does not prevent or adversely affect Plaintiff's rights to bring an action in United States District Court to enforce rights created by federal law. *Sierra Ass'n for Environment v. Federal Energy Regulatory Commission,* 744 F.2d 661, 662 (9th Cir.1984) (citing *Woods v. Interstate Realty Co.,* 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949)).

52. Further, Fed.R.Civ.P. 17(b)(1) provides, *inter alia:*

> The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law in which the district court is held, *except ... that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United states....*

(Emphasis added).

Thus, if the instant action were brought pursuant to the Court's diversity jurisdiction, Idaho law would control and determine whether Plaintiff has the capacity to bring the instant action. However, because this action was brought under the Lanham Act, a law of the United States creating substantive rights, Plaintiff is allowed to sue as an unincorporated association despite its incapacity under Idaho law. *Sierra Ass'n,* 744 F.2d at 662; *see Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 53 (2d Cir.1991). Consequently, the Court must determine whether Plaintiff is an unincorporated association for purposes of Rule 17(b)(1).

■ 53. Where a plaintiff brings an action to enforce rights existing under federal law, the determination of whether the plaintiff is an unincorporated association for purposes of Rule 17(b)(1) is a question of federal, not state, law. *Associated Students of University of California at Riverside v. Kleindienst,* 60 F.R.D. 65, 67 (C.D.Cal.1973).

54. Under federal law, the general definition of "unincorporated association" for pur-

poses of Rule 17(b)(1) where an organization sues to enforce a right existing under federal law has been very broad: "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective." *Local 4076, United Steelworkers v. United Steelworkers*, 327 F.Supp. 1400, 1403 (W.D.Pa.1971).[1]

55. The Second Circuit has even suggested that it may be sufficient if an organization simply sues in its common name to qualify as an unincorporated association for purposes of a Rule 17(b)(1) action brought under federal law. *Klinghoffer*, 937 F.2d at 53.

56. Having made the necessary findings for purposes of Plaintiff's capacity to sue, the Court concludes as a matter of law that Plaintiff is clearly an unincorporated association for purposes of Rule 17(b)(1) and is therefore authorized and has standing to bring the instant action in its common name, "Committee for Idaho's High Desert."

### B. *Unregistered Trademarks*

57. The Lanham Act was designed "to make 'actionable the deceptive and misleading use of marks' and 'to protect persons engaged in ... commerce against unfair competition.' " *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992) (quoting § 45, 15 U.S.C. § 1127).

58. Section 32 of the Lanham Act, 15 U.S.C. § 1114, protects registered trademarks. *Id.* (quoting *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 858, 102 S.Ct. 2182, 2190–91, 72 L.Ed.2d 606 (1982)).

■ 59. However, it is well established that § 43(a), 15 U.S.C. § 1125(a), extends the protection of the Lanham Act to qualifying unregistered trademarks; it is therefore unnecessary that a mark be registered to ob-

tain protection under § 43(a). *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2757 (citations omitted); *Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993); *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1198 (9th Cir. 1979).

60. Consequently, "the general principles qualifying a mark for registration under ... the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)," *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2757 (citing *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 299 n. 9 (3d Cir. 1986); *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 215–16 (2d Cir.1985)).

61. Plaintiff brings the instant action primarily under § 43(a) of the Lanham Act, alleging trademark and trade name infringement, as well as unfair competition.

■ 62. The purpose of § 43(a) of the Lanham Act is to prevent consumer confusion regarding the *source* of a product or service. *Centaur Communications, Ltd. v. A/S/M Communications*, 830 F.2d 1217, 1220 (2d Cir.1987) (citations omitted). *See also New West*, 595 F.2d at 1198.

63. Section 43(a) provides, in pertinent part, as follows:

> Any person who shall ... use in connection with any goods or services ... a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by use of any such false description or representation.

64. It is also well settled that because § 43(a) "prohibits a broader range of practices than does § 32," *Two Pesos*, —— U.S. at

---

1. For nearly identical definitions of "unincorporated association" for purposes of the Rule 17(b)(1)'s federal law exception, *see Penrod Drilling Co. v. Johnson*, 414 F.2d 1217, 1222 (5th Cir.1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 495 (1970); *Delta Coal Program v. Libman*, 554 F.Supp. 684, 687 n. 1 (N.D.Ga. 1982), *aff'd*, 743 F.2d 852 (11th Cir.1984); *Health Care Equalization Comm. of the Iowa Chi-*

*ropractic Soc'y v. Iowa Medical Soc'y*, 501 F.Supp. 970, 976 (S.D.Iowa 1980), *aff'd*, 851 F.2d 1020 (8th Cir.1988); *Associated Students of University of California at Riverside v. Kleindienst*, 60 F.R.D. 65, 67 (C.D.Cal.1973); *Yonce v. Miners Memorial Hosp. Ass'n*, 161 F.Supp. 178, 186 (W.D.Va.1958). *Cf. Hecht v. Malley*, 265 U.S. 144, 157, 44 S.Ct. 462, 467, 68 L.Ed. 949 (1924).

——, 112 S.Ct. at 2757 (citing *Inwood Lab.,* 456 U.S. at 858, 102 S.Ct. at 2190–91), such as unfair competition, " 'the ultimate test' for unfair competition is exactly the same as for trademark infringement." *Century 21 Real Estate Corp. v. Sandlin,* 846 F.2d 1175, 1178 (9th Cir.1988). *See also E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1288 & n. 2 (9th Cir.1992); and 1 *McCarthy on Trademarks and Unfair Competition* § 2.03 at 2–16 (3d ed. 1994).

## C. *Trademarks Versus Trade Names*

65. Defendants contend that because Plaintiff has used the name "Committee for Idaho's High Desert" only as a trade name and not as a trademark, Plaintiff's use of that name is not protected by the Lanham Act. Defendants' contention in this respect is not supported by controlling law.

■ 66. Plaintiff's primary use of its name has undoubtedly been as a trade name. However, the Court also finds that Plaintiff has used its name as a trademark in certain instances, and it is well established that § 43(a) of the Lanham Act can also be used as a vehicle for actions against *trade name* infringement. *Accuride Int'l v. Accuride Corp.,* 871 F.2d 1531, 1534 (9th Cir.1989); *McCarthy,* § 9.01[1]–[3]. *See also American Steel Foundries v. Robertson,* 269 U.S. 372, 380, 46 S.Ct. 160, 162, 70 L.Ed. 317 (1926); *New West,* 595 F.2d at 1201; and *Blinded Veterans Ass'n v. Blinded Veterans Found.,* 872 F.2d 1035, 1041 n. 11 (D.C.Cir.1989).

67. Trademarks and trade names are technically distinct:

Trade names are symbols used to distinguish *companies, partnerships and businesses.* Trade names symbolize the reputation of the business as a whole. In contrast, trademarks are designed to identify and distinguish a company's *goods and services.*

*Accuride,* 871 F.2d at 1534 (emphasis added) (citing *New West,* 595 F.2d at 1201 ("[a] trade name is descriptive of the manufacturer or dealer himself and applies to a business and its good will, whereas a trade-mark, in a technical sense, is applicable to the *vendible*

*commodities* ") (emphasis added)); *See also McCarthy,* § 9.01[3] at 9–6.

■ 68. However, the Supreme Court settled this issue long ago when it held: Whether the name of a corporation is to be regarded as a trade-mark, a trade name, or both, is not entirely clear under the decisions. To some extent the two terms overlap, but there is a difference more or less definitely recognized, which is, that, generally speaking, *the former is applicable to the vendible commodity to which it is affixed, the latter to a business and its good will. A corporate name seems to fall more appropriately into the latter class. But the precise difference is not often material, since the law affords protection against its appropriation in either view upon the same fundamental principles.*

*American Steel Foundries,* 269 U.S. at 380, 46 S.Ct. at 162 (emphasis added) (citation omitted). Although the major legal distinction between trademarks and trade names is that trade names cannot be registered and are therefore not protected under 15 U.S.C. § 1114, it is clear that "analogous actions for trade name infringement can be brought under section 43(a)." *Accuride,* 871 F.2d at 1534 (citing *New West,* 595 F.2d at 1198–1201; *Walt–West Enterprises, Inc. v. Gannett Co.* 695 F.2d 1050, 1054 n. 6 (7th Cir. 1982)).

69. Consequently, notwithstanding that trademarks technically apply to *vendible products* while trade names apply to a business and its good will, the same analysis for trademark infringement applies to wrongful appropriation of a trade name under § 43(a). *American Steel Foundries,* 269 U.S. at 380, 46 S.Ct. at 162; *Accuride,* 871 F.2d at 1534–35; *New West,* 595 F.2d at 1201; *Blinded Veterans,* 872 F.2d at 1041 n. 11; *McCarthy,* § 901[1]–[3]. Accordingly, the following trademark infringement analysis will also be deemed an analysis of Plaintiff's trade name infringement claims.

## D. *Non-profit Organizations*

■ 70. There has been some dispute whether Plaintiff must sell a product in commerce in order to obtain protection of its name. If this dispute has not been settled by the foregoing discussion establishing that

a trade name is entitled to protection without regard to its business and good will rather than to vendible products, it is clear that the names of charitable, educational, and other non-profit organizations are entitled to protection under the Lanham Act regardless of whether or not they place products into the stream of commerce:

> The fact that an organization is non-profit and sells no goods does not take it out of the protection of the law of unfair competition.
>
>    *     *     *     *     *     *
>
> The retention of a distinct identity here is just as important as it is to a commercial company. If the distinct identity of such non-profit organizations is lost through a confusingly similar use of a name by another, then it is obvious that the organization will have serious difficulty in raising funds and attracting members and support.

*McCarthy,* § 9.02[1] at 9–11 (extensively citing cases). *See also United States Jaycees v. San Francisco Jr. Chamber of Commerce,* 354 F.Supp. 61, 71 (N.D.Cal.1972) ("... it cannot be ignored that the common law of trademark infringement and unfair competition is replete with cases holding that benevolent, religious, charitable, or fraternal organizations are entitled to injunctive relief protecting against the continued use of their name by local chapters which disaffiliate.") (citing numerous cases), *aff'd* 513 F.2d 1226 (9th Cir.1975). *See generally Blinded Veterans,* 872 F.2d at 1035 (charitable organization promoting interests of blinded veterans allowed to sue under Lanham Act for another's use of a similar trade name); *Girls Clubs of America, Inc. v. Boys Clubs of America, Inc.,* 683 F.Supp. 50 (S.D.N.Y.1988) (same with respect to benevolent girls organization), *aff'd without op.,* 859 F.2d 148 (2d Cir.1988).

Therefore, although Plaintiff is a non-profit organization, the following general trademark principles, though often referring to vendible goods in commerce, also applies to Plaintiff's claims based on trade name infringement even if no goods or services were exchanged in commerce.

### E. *General Legal Standards Under the Lanham Act*

■ 71. In order to prevail on its Lanham Act claims based on trademark or trade name infringement, Plaintiff has the burden to show two things: (1) Plaintiff's mark or name is entitled to protection; and (2) Defendants' use of the same or similar mark or name causes a likelihood of confusion in the minds of the relevant consuming public. *Levi Strauss v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir.1985) (en banc). *See also Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757–58; *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1014–17 (9th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Centaur Communications,* 830 F.2d at 1221; *McCarthy,* § 11.01, *et seq.*

■ 72. Once these two elements are met, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue. *Metro Publishing,* 987 F.2d at 640; *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 611 n. 3 (9th Cir.1989); *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1220 (9th Cir.1987) (citing *Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 526 (9th Cir.1984)).

■ 73. A trademark is defined in 15 U.S.C. § 1127 as including "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2757. *See also Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1390 (9th Cir.1993). Consequently, the determination of whether a mark or name is entitled to protection depends upon its distinctiveness; i.e., the extent to which it is capable of distinguishing the goods or services that it names as coming from a particular source. *Two Pesos,* —— U.S. at ——–——, 112 S.Ct. at 2757–58; *Official Airline Guides,* 6 F.3d at 1390.

74. The strength or distinctiveness of a mark or name is measured in terms of its general location along a "continuum of marks

from 'generic,' afforded no protection; through descriptive or suggestive, given moderate protection; to 'arbitrary' or 'fanciful' awarded maximum protection." *Gallo*, 967 F.2d at 1291 (quoting *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 605 (9th Cir.1987)). *See also Two Pesos*, —— U.S. at ——–——, 112 S.Ct. at 2757–58; *Official Airline Guides*, 6 F.3d at 1390; *Accuride*, 871 F.2d at 1536; *Rodeo Collection*, 812 F.2d at 1218; *McCarthy*, § 11.01[1].

75. Fanciful, arbitrary, and suggestive marks are given the greatest or widest ambit of protection because they are inherently distinctive; i.e., they identify the particular *source* of a product or service, and therefore distinguish their products or services by their *source* rather than by merely telling something about the product or services. *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2757; *Official Airline Guides*, 6 F.3d at 1390–91.

76. Generic names are not protected under any circumstances, because they merely "refer to the genus of which the particular product is a species," and therefore cannot indicate origin. *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2757 (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985)); *Official Airline Guides*, 6 F.3d at 1391; *Transgo*, 768 F.2d at 1014 (citing *Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 302 (9th Cir. 1979)); *Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir.1979), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468, *reh'g denied*, 460 U.S. 1104, 103 S.Ct. 1805, 76 L.Ed.2d 369 (1983); *McCarthy*, § 12.01[1].

77. In between the inherently distinctive marks, which qualify for the greatest or widest ambit of protection, and generic marks, which are not entitled to protection, are *descriptive* marks, which may or may not qualify for protection. A descriptive mark or name does not merely denote that the product or service is of a particular genus, but rather indicates with specificity a particular characteristic or ingredient of the product or service. *Park 'N Fly*, 469 U.S. at 194, 105

S.Ct. at 661; *Transgo*, 768 F.2d at 1014; *Surgicenters of America*, 601 F.2d at 1014; *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.1979); *Blinded Veterans*, 872 F.2d at 1039–40.

78. However, because a descriptive mark or name merely describes the product or service, it normally does not indicate its source or origin and therefore is not ordinarily entitled to protection. *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2757; *Official Airline Guides*, 6 F.3d at 1391; *Transgo*, 768 F.2d at 1014 (citing 15 U.S.C. § 1052(e)(1)); *McCarthy*, § 11.05[1] (citing *Two Pesos, supra*).

79. A descriptive mark or name may nevertheless obtain protection under the Lanham Act if it "has become distinctive of the applicant's goods in commerce"; i.e., if it has acquired distinctiveness through "secondary meaning." 15 U.S.C. §§ 1052(e), (f); *Two Pesos*, —— U.S. at ——, 112 S.Ct. at 2757; *Official Airline Guides*, 6 F.3d at 1391; *Rodeo Collection*, 812 F.2d at 1218; *Transgo*, 768 F.2d at 1015; *American Scientific Chemical, Inc. v. American Hosp. Supply*, 690 F.2d 791, 792 (9th Cir.1982); *Sleekcraft*, 599 F.2d at 349.

80. An otherwise merely descriptive mark or name acquires secondary meaning, and therefore the distinctiveness required for protection under the Lanham Act, when the mark denotes to the consuming public "a single thing coming from a single source." *Transgo*, 768 F.2d at 1015 (quoting *Carter–Wallace, Inc. v. Procter & Gamble, Co*, 434 F.2d 794, 802 (9th Cir.1970)). "Secondary meaning has been defined as association [between name and source], nothing more." *Transgo*, 768 F.2d at 1015 (quoting *Carter–Wallace*, 434 F.2d at 802, also quoted in *American Scientific Chem.*, 690 F.2d at 792).

Accordingly, the focus is upon whether "the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938), *quoted in American Scientific Chem.*, 690 F.2d at 792, and *Blinded Veterans*, 872 F.2d at 1040. *See*

*also Official Airline Guides,* 6 F.3d at 1391; *Gallo,* 967 F.2d at 1291 (citing *Levi Strauss,* 778 F.2d at 1354); and *Centaur Communications,* 830 F.2d at 1221.

81. The general rule, then, is that "an identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos,* —— U.S. at ——, 112 S.Ct. at 2758 (citing Restatement (Third) of Unfair Competition, § 13, pp. 37–38, and Comment a (Tent.Draft No. 2, Mar. 23, 1990); and *Park 'N Fly,* 469 U.S. at 194, 105 S.Ct. at 661–662)).

82. Therefore, fanciful, arbitrary, and suggestive marks do not require proof of secondary meaning for protection under the Lanham Act, while a descriptive mark does require such proof. *Sleekcraft,* 599 F.2d at 349; *McCarthy,* § 11.02 at 11–8.1—11.9; and § 11.05[1]. *See also Two Pesos,* —— U.S. at —— – ——, 112 S.Ct. at 2757–58; and *Official Airline Guides,* 6 F.3d at 1391.

83. Whether a mark has attained secondary meaning, and indeed classifying a mark on the spectrum of distinctiveness, is generally considered a factual issue. *WSM, Inc. v. Hilton,* 724 F.2d 1320, 1326 (8th Cir. 1984); *McCarthy,* §§ 11.01[2] (extensively citing cases) and 11.09 at 11–43. *See also Transgo,* 768 F.2d at 1015; *American Scientific Chem.,* 690 F.2d at 792 (citing *Norm Thompson Outfitters, Inc. v. General Motors Corp,* 448 F.2d 1293, 1296 (9th Cir.1971)).

### 1. *Geographically descriptive nature of* "CIHD"

84. The Court will begin its analysis with Defendants' assertion that the name "Committee for Idaho's High Desert" is merely descriptive and therefore ineligible for protection. Defendants argue that Plaintiff's name is simply a composite of what are primarily geographically descriptive terms, "Idaho's high desert," with a generic term, "committee." Therefore, Defendants assert, because neither generic terms nor merely geographically descriptive terms are entitled to protection, Plaintiff's name as a whole is not entitled to protection under § 43(a).

85. It is true, as Defendants maintain, that terms which are merely geographically descriptive, without proof of secondary meaning, do not qualify for protection under the Lanham Act because they are not distinctive enough to indicate its origin within that geographic location. *Canal Co. v. Clark,* 80 U.S. 311, 324, 20 L.Ed. 581 (1872); *McCarthy,* § 14.01 at 14–3 (citing Restatement (Third) of Unfair Competition § 14, comment d (Tentative Draft No. 2 1990)).

86. Although the boundaries or limits of Idaho's high desert are not universally recognized, the terms "Idaho's high desert" does indeed describe an identifiable geographical region in Idaho. *Cf. McCarthy,* 14.02[1] n. 10 (citing *Indian Territory Oil & Gas Co. v. Indian Territory Illuminating Oil Co.,* 95 F.2d 711 (10th Cir.1938), *cert. denied,* 305 U.S. 607, 59 S.Ct. 67, 83 L.Ed. 386 (1938) ("indian territory" held to be geographically descriptive); *American Can Co. v. Dixie Wax Paper Co.,* 150 USPQ 823 (TTAB 1966), *aff'd,* 56 CCPA 957, 407 F.2d 420 (1969) ("dixie" held to be geographically descriptive); and *Carolina Co. v. Pinehurst Handmade Soap & Candle Co.,* 153 USPQ 880 (TTAB 1967) ("southland" held to be geographically descriptive)).

87. However, it is well established that the validity of a composite mark of more than one term must be determined by examining the mark as a whole and as it appears in the marketplace and not from its elements separated and considered in detail or by dissecting it into parts to view it piece by piece. *Estate of P.D. Beckwith v. Commissioner of Patents,* 252 U.S. 538, 545–46, 40 S.Ct. 414, 416–17, 64 L.Ed. 705 (1920); *Rodeo Collection,* 812 F.2d at 1218; *California Cooler, Inc. v. Loretto Winery Ltd,* 774 F.2d 1451, 1455 (9th Cir.1985). *See also Official Airline Guides,* 6 F.3d at 1392; *Gallo,* 967 F.2d at 1291; *Vision Sports,* 888 F.2d at 616. "Words which could not individually become a trademark may become one when taken together." *California Cooler,* 774 F.2d at 1455. In this respect, the Ninth Circuit has explicitly held that "[a] composite *geographical mark* should not be dissected into its parts to determine whether it is primarily geographical or not." *Id.* at 1455 (emphasis

added) (quoting *McCarthy*, § 14:6 at 496 (1973)) (citing *Estate of Beckwith, supra*).

■ 88. It is clear at this point, and the Court concludes, that the addition of "committee for" to "Idaho's high desert" prevents the name as a whole from being primarily *geographically* descriptive. If descriptive at all, it would be descriptive of some aspect of Plaintiff's business rather than limited to a geographical location of origin. Consequently, Defendants' invocation of the "fair use" defense, which allows a seller to use a geographically descriptive term even though it has acquired secondary meaning of a different seller, is of no avail. *See generally McCarthy*, § 14.07. Plaintiff does not seek to enjoin Defendants from using the terms "Idaho's high desert"; rather, it seeks to enjoin use of *"Committee for* Idaho's High Desert."

### 2. *Arbitrary Nature of "CIHD"*

■ 89. As the foregoing indicates, if a geographical term is combined with other elements to form a composite mark, the resulting combination may result in a mark that is arbitrary or suggestive. *See McCarthy*, §§ 11.10[1] at 11–45; 14.06 at 14–21—14–23 (extensively citing cases).

■ 90. An arbitrary mark consists of common words arranged in an arbitrary way that are non-descriptive of *any* quality or feature of the goods or services. *Official Airline Guides*, 6 F.3d at 1391 (citing *Stork*

*Restaurant Inc. v. Sahati*, 166 F.2d 348, 355 (9th Cir.1948) ("[The Stork Club] is in no way descriptive of the appellant's night club, for in its primary significance it would denote a club for storks.")); *McCarthy*, § 11.04[1] at 11–14.

■ 91. Plaintiff contends that because the common understanding of the word "committee" is "[a] group of people *delegated* to perform a particular function or task," *Webster's II New Riverside Dictionary* 287 (6th ed. 1984), and because Plaintiff has not been delegated authority from anyone other than itself to conduct its business, the addition of "committee" to Plaintiff's name is arbitrary.

92. Because the aforementioned categories, "like colors in a spectrum, tend to blur at the edges and merge together, making it difficult to apply the appropriate label," *WSM*, 724 F.2d at 1325, a review of cases concluding that the mark in question was arbitrary is probably the most effective way of determining whether the name in question is arbitrary. Such a review quickly reveals that the name "Committee for Idaho's High Desert" is not completely arbitrary, but is at least suggestive of Plaintiff's business.[2] Whether or not Plaintiff was actually delegated authority to conduct its business, its name at least suggests a group of people whose business or activities in some respect pertain to Idaho's high desert regions. Consequently, the Court concludes that the name

**2.** *See McCarthy*, 11.04[3], which lists the following as having been held as arbitrary:

—BLACK AND WHITE Scotch Whiskey, (*Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149 (9th Cir.1963), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963);

—CONGRESS spring water, *Congress & Empire Spring Co. v. High Rock Congress Spring Co.*, 45 N.Y. 291 (1871);

—COMMAND hair care products, *Alberto–Culver Co. v. Helene Curtis Indus. Inc.*, 167 USPQ 365 (TTAB 1970);

—FLASH music group, *Anderson v. Capitol Records, Inc.*, 178 USPQ 238, 1973 WL 19859 (Cal.Super.1973);

—HORIZON Banking services, *Horizon Financial, F.A. v. Horizon Bancorp*, 2 USPQ2d 1696, 1987 WL 6333 (E.D.Pa.1987);

—ICE CREAM chewing gum, *Borden, Inc. v. Topps Chewing Gum, Inc.*, 173 USPQ 447 (TTAB 1972);

—JELLIBEANS roller skating rink, *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 212 USPQ 170, 1981 WL 40564 (N.D.Ga.1981), *aff'd*, 716 F.2d 833 (11th Cir.1983);

—LAMBDA computer equipment, *Lambda Elec. Corp. v. Lambda Tech. Inc.*, 515 F.Supp. 915 (S.D.N.Y.1981);

—MUSTANG motel, *Mustang Motels, Inc. v. Patel*, 226 USPQ 526, 1985 WL 72659 (C.D.Cal. 1985);

—NOVA television series, *WGBH Educ. Found., Inc. v. Penthouse Int'l, Ltd.*, 453 F.Supp. 1347 (S.D.N.Y.1978), *aff'd without op.*, 598 F.2d 610 (2d Cir.1979);

—SUN bank, *Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan Ass'n*, 211 USPQ 844, 651 F.2d 311 (5th Cir.), *reh'g denied*, 659 F.2d 1079 (5th Cir.1981); and

—TEA ROSE flour, *Hanover Star Mill. Co. v. Allen & W. Co.*, 208 F. 513 (7th Cir.1913).

"Committee for Idaho's High Desert" is not arbitrary.

### 3. The Suggestive/Descriptive Nature of "CIHD"

93. A "suggestive" mark or name "do[es] not directly describe a product or service," *Blinded Veterans*, 872 F.2d at 1040, but still "subtly connote[s] something about the products," *Sleekcraft*, 599 F.2d at 349, therefore "requir[ing] imagination to make a connection between the mark and an attribute of the product." *Official Airline Guides*, 6 F.3d at 1391.

94. However, because both descriptive and suggestive marks denote something about the product or business, "[t]he line separating the two is uncertain; extrapolating the line from precedent would be impossible." *Sleekcraft*, 599 F.2d at 349. Therefore, litigation over descriptiveness typically resolves into a dispute as to whether a given mark should be characterized as descriptive or suggestive, because the former requires proof of secondary meaning, while the latter does not. *See McCarthy*, § 11.06[4].

For these reasons, although the Court concludes that the name "Committee for Idaho's High Desert" is suggestive, the Court will also determine whether the name has acquired secondary meaning as a descriptive mark for purposes of clarity and judicial economy.

95. Although the precise line distinguishing between a suggestive mark and a merely descriptive mark cannot be precisely articulated, the following are well-recognized criteria are helpful:

a. "Imagination Test": the amount of imaginativeness involved in the suggestion; "that is, how immediate and direct is the thought process from the mark to the particular product [service, or business]." *Sleekcraft*, 599 F.2d at 349. "If a consumer must use more than a small amount of imagination to make the association, the mark is suggestive and not descriptive." *Rodeo Collection*, 812 F.2d at 1218 (citing *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 350 (9th Cir. 1980); *Sleekcraft*, 599 F.2d at 349).

b. "Need Test": the extent to which a mark is actually needed by competitors to identify their goods or services. *Rodeo Collection*, 812 F.2d at 1218.

> [If] the suggestion made by the mark [is] so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods [or services] ... this tends to indicate that the mark is merely suggestive, not descriptive. If, however, the message conveyed by the mark about the goods or services is so direct and clear that competing sellers would be likely to [need to] use the term in describing or advertising their goods [or services], then this indicates that the mark is descriptive.

*Id.* (quoting *McCarthy*, § 11:21 at 493 (2d ed. 1984)).

Thus, the "imagination test" and "need test" are related because the more imagination that is required to associate the name with the product or service; the less likely a competitor will need to use the same mark to describe its own product or service. *Rodeo Collection*, 812 F.2d at 1218 (citing *Union Carbide v. Ever–Ready Inc.*, 531 F.2d 366, 379 (7th Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976)).

c. "Competitor Use Test": the extent to which other sellers or competitors have used the name to describe similar products or services. "That is, if others are in fact using the term to describe their products, an inference of descriptiveness can be drawn." *McCarthy*, § 11.21[3] at 11–111. On the other hand, a plaintiff and defendant's use of the same name to denote two different kinds of company or service undercuts a claim of mere descriptiveness. *West & Co. v. Arica Inst., Inc.*, 557 F.2d 338, 342 (2d Cir. 1977).

96. With respect to the "imagination test," although "Committee for Idaho's High Desert" suggests a group of people engaged in some kind of business regarding Idaho's high desert regions, it "suggests a number of things but [ ] does not describe any one thing in particular." *Arica*, 557 F.2d at 342. The Court finds and concludes that more than a small amount of imagination is required to determine from the name "Committee for

Idaho's High Desert" that Plaintiff's activities include the provision of public lectures, seminars, slide shows, and hikes, and representation for the like-minded public and its members through extensive interaction with the governmental agencies in their disposition of various environmental issues, all presented with a view toward preserving or conserving the desert regions in their natural state and emphasizing uses other than traditional consumptive uses thereof, such as agriculture.[3]

97. With respect to the "need" test, although competitors may need to use the terms "Idaho's high desert" to describe their business, goods, or services as pertaining to that region, as the Court has already noted, the name must be viewed as a whole and as it appears in the marketplace, not dissected into parts. Consequently, addition of the terms "committee" and particularly "for" to "Idaho's high desert" suggests something about Plaintiff and its activities, but only indirectly and subtly so.

As Mr. Hoffman testified, he and the other Defendants could have chosen many other names that could describe their organization and its purposes. Indeed, the record establishes that Defendants actually discussed the use of other, completely different names that were suggestive or descriptive of their organization. This indicates to the Court that "Committee for Idaho's High Desert" does not convey a clear or direct message that competitors would need to describe themselves or their services.

98. This conclusion is reinforced by results of the "competitor's use test"—no one else has used the name "Committee for Idaho's High Desert" except Plaintiff, until Defendants incorporated under that name in 1993. The absence of the use of Plaintiff's name by other organizations which deal with the same issues and offer similar services in Idaho further indicates the lack of competitors' need to use that name, and therefore, the extent of imagination required to make the connection between the name and the services or activities of Plaintiff.

Perhaps most telling in the Court's view is the fact that Defendant corporation, although formed to deal with the same issues and provide similar services as Plaintiff, is a political and philosophical opponent. Yet, despite this clear philosophical opposition, Defendants nevertheless chose to adopt and use Plaintiff's exact name. If the name in question can be used by organizations who are adversaries on common issues of interest to them both, then the name must not be merely descriptive; rather, imagination must be used to ascertain which side the organizations support. *See Arica,* 557 F.2d at 342.

99. In light of the foregoing case law, and applying the relevant criteria, the Court concludes that the name "Committee for Idaho's High Desert" is suggestive and not merely descriptive. Accordingly, that name is inherently distinctive and is entitled to protection under the Lanham Act without proof of secondary meaning.

### 4. *Secondary Meaning of "CIHD"*

100. As previously mentioned, due to the inherent difficulty in determining with preci-

---

**3.** *See Healing the Children, Inc. v. Heal the Children, Inc.,* 786 F.Supp. 1209 (W.D.Pa.1992), which, like the instant action, also involves a charitable, non-profit organization's trade name infringement claim brought under § 43(a) of the Lanham Act. In holding that the name "Healing the Children" was suggestive rather than merely descriptive, the court reasoned as follows:

In this case, "Healing the Children," does suggest an organization which benefits children in a salutary, curative, beneficial, or remedial way. *But it is only with imagination that the consumer can determine that the organization's activities include coordinating medical teams which visit foreign countries to train local medical personnel and to provide acute care and diagnostic services for local children, and orga-* *nizing transportation, visas, medical care, and foster care for children referred to plaintiff by cooperating foreign governments and private agencies.* [Cites record]. We must, therefore conclude that "Healing the Children" is a suggestive mark and entitled to protection under § 43(a) of the Lanham Act.

*Id.* at 1213 (emphasis added). As the above case is almost directly on point with the instant action, the Court is persuaded by its holding that in order to be descriptive rather than suggestive, a trade name must describe some aspect of the organization with particularity rather than merely providing a vague depiction thereof which requires some imagination to associate the name with the group's activities.

sion whether a name is suggestive or descriptive, and in order to avoid possible future conflict, the Court will also determine whether the name "Committee for Idaho's High Desert," if descriptive in any respect, is nevertheless entitled to protection as having acquired secondary meaning.

101. Secondary meaning occurs when the consuming public associates the name with its source. *Transgo,* 768 F.2d at 1015. The focus is upon whether the primary significance of the term in the minds of the consuming public is not the product but the producer. *Id.; Kellogg,* 305 U.S. at 118, 59 S.Ct. at 113.

102. Factors to consider in determining whether a name has acquired secondary meaning include: (1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer; (2) the degree and manner of advertising under the claimed trademark; (3) the length and manner of use of the claimed trademark; and (4) whether use of the claimed trademark has been exclusive. *Vision Sports,* 888 F.2d at 615; *Levi Strauss,* 778 F.2d at 1358, *citing Transgo,* 768 F.2d at 1015.

103. Having found that the relevant consuming public has come to associate the name "Committee for Idaho's High Desert" and "CIHD" with Plaintiff, and that the name denotes a single thing coming from a single source, the Court concludes that this factor indicates the existence of secondary meaning.

104. Having also found that Plaintiff has done a significant amount of advertising of its activities, the Court concludes that the second factor also indicates that secondary meaning exists.

105. Finally, having made the necessary findings of fact for purposes of the third and fourth factors, and based on all the evidence, the Court concludes that Plaintiff's continuous use of the name "Committee for Idaho's High Desert," whether directly affixed to the goods it sells, expressed in the provision of the services, or otherwise used in its business, has been exclusive since at least 1980 until Defendants incorporated under the same name on September 14, 1993. Therefore, the third and fourth factors also strongly indicate the existence of secondary meaning.

106. As a result of Plaintiff's exclusive and continuous use of its name, Plaintiff has gained substantial notoriety, influence, and prominence in the public debate over the use of natural resources in the desert areas of southern Idaho and the surrounding desert regions, particularly on the issues of wilderness and wild and scenic river designation, and the Mountain Home Air Force training range dispute. Consequently, the Court finds and concludes that the four factors mentioned above persuasively indicate secondary meaning.

### 5. *Likelihood of Confusion*

107. Finally, the Court will consider whether Plaintiff has shown a likelihood of confusion in Defendants' adoption and use of its name. Consideration of likelihood of confusion serves two important functions. First, as previously mentioned, it is the core element of trademark infringement, no matter how distinctive the mark. Lanham Act § 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A); *Official Airline Guides,* 6 F.3d at 1391 (quoting *Gallo,* 967 F.2d at 1290); *Metro Publishing,* 987 F.2d at 640.

Second, likelihood of confusion is another, and perhaps one of the most important, factor in ascertaining whether a name or mark has acquired secondary meaning. *Transgo,* 768 F.2d at 1015 (citation omitted); *Surgicenters of America,* 601 F.2d at 1018–19 (citation omitted); *McCarthy,* § 15.03 at 15–20. *Cf. Levi Strauss,* 778 F.2d at 1359; *American Scientific Chem.,* 690 F.2d at 793.

108. A likelihood of confusion exists when consumers "are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Metro Publishing,* 987 F.2d at 640 (quoting *Nutri/System,* 809 F.2d at 604).

109. Secondary meaning and likelihood of buyer confusion are separate but related issues, the relationship arising from the same

**1478**

evidentiary findings. *Transgo,* 768 F.2d at 1015. The reason likelihood of confusion is an important indicia of secondary meaning is that:

If buyers are confused, then this also means that they must have recognized plaintiff's word as a trademark and associated it only with plaintiff. If this is not so, how could there be any confusion?

*McCarthy,* § 15.03 at 15–20. Indeed, as the Ninth Circuit has recognized:

A buyer cannot, however, be "confused unless he is looking for a label he recognizes and picks up another in his confusion. Ergo, a buyer who does not recognize plaintiff's 'mark' and does not distinguish it from any other, cannot be confused."

*Levi Strauss,* 778 F.2d at 1359 (quoting 1 *McCarthy,* § 15:3 at p. 668 (2d ed. 1984)). Thus, if the consuming public is likely to be confused by Defendants' use of the name "Committee for Idaho's High Desert," then the name must necessarily have a secondary meaning with which to be confused.

110. The Ninth Circuit has developed an eight-factor test to evaluate likelihood of confusion, initially set out in *Sleekcraft,* 599 F.2d at 348–49. These factors include the following:

1. strength of the allegedly infringed mark;
2. proximity or relatedness of the goods;
3. similarity of the sight, sound, and meaning of the marks;
4. evidence of actual confusion;
5. degree to which marketing channels converge;
6. type of goods and degree of care consumers are likely to exercise in purchasing them;
7. intent of the defendant in selecting the allegedly infringing mark; and
8. likelihood that the parties will expand their product lines.

*See also Official Airline Guides,* 6 F.3d at 1391; *Metro Publishing,* 987 F.2d at 640, citing *Gallo,* 967 F.2d at 1290–91. The Court will apply and analyze each relevant factor below.

111. This list of factors is neither exhaustive nor exclusive; "[r]ather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion.... The presence or absence of a particular factor does not necessarily drive the determination of a likelihood of confusion." *Gallo,* 967 F.2d at 1290–91 (citing *Eclipse Associates Ltd. v. Data General Corp.,* 894 F.2d 1114, 1118 (9th Cir.1990)). *See also Official Airline Guides,* 6 F.3d at 1391; *Sleekcraft,* 599 F.2d at 348 n. 11. Consequently, not every factor is relevant or necessary in every case. *Metro Publishing,* 987 F.2d at 640.

### a. *Strength of Name*

112. Strength of a name and its distinctiveness are related concepts—the stronger the name, the more distinctive it is, and therefore the more likely the relevant consuming public associates the name with a particular source. *Official Airline Guides,* 6 F.3d at 1392. Like distinctiveness, the strength of a name is also measured in terms of its general location along the continuum of marks from generic, inherently weak marks, through fanciful, inherently strong marks. *Gallo,* 967 F.2d at 1291; *Accuride,* 871 F.2d at 1536; *Rodeo Collection,* 812 F.2d at 1218; *Sleekcraft,* 599 F.2d at 349.

113. A weak trade name may be strengthened by such factors as extensive advertising, length and exclusive use, public recognition, and uniqueness. *Accuride,* 871 F.2d at 1536. Further, whether a mark is weak and descriptive or strong and distinctive "can be determined only by reference to the goods or services that it identifies. Thus, the mark BRILLIANT may be 'descriptive' on diamonds, 'suggestive' on furniture polish, and 'arbitrary' on canned applesauce." *Rodeo Collection,* 812 F.2d at 1218 (citing *McCarthy,* § 11:20 at 489 (2d ed. 1984)).

114. Having made the necessary findings of fact in regard to the strength and distinctiveness of the name "Committee for Idaho's High Desert," the Court concludes that the aforesaid name is fairly strong in light of the foregoing considerations, such as Plaintiff's extensive and exclusive use of its name, and public advertising, and recognition.

### b. *Proximity of the Goods*

█ 115. Consumer confusion is much more likely where the parties' goods or services are related or complementary. *Official Airline Guides*, 6 F.3d at 1392; *Gallo*, 967 F.2d at 1291 (citing *Sleekcraft*, 599 F.2d at 350). "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. Moreover, the more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion. *Id.* (citing *American Steel Foundries*, 269 U.S. at 382, 46 S.Ct. 160 (1926); *Russell Chemical Co. v. Wyandotte Chem. Corp.*, 337 F.2d 660, 52 C.C.P.A. 807 (1964)).

116. Having made the necessary findings of fact in this regard, the Court concludes that the actual and planned business activities of Defendants are similar to those of Plaintiff. There is a clear danger that the public will mistakenly assume that there is an association between Plaintiff and Defendants, particularly in light of the fact that Defendants adopted and used Plaintiff's exact name. Indeed, the evidence presented during the trial demonstrates actual instances of such a mistaken association. Therefore, the Court finds and concludes that this factor weighs heavily in favor of likelihood of confusion.

### c. *Similarity of the Names*

█ 117. The similarity between two names is assessed in terms of their sight, sound, and meaning. *Official Airline Guides*, 6 F.3d at 1392 (citing *Fruit of the Loom, Inc. v. Girouard*, 994 F.2d 1359, 1363–64 (9th Cir.1993)). And, as previously discussed at length above a mark must be viewed as a whole, as it appears in the marketplace. *Official Airline Guides*, 6 F.3d at 1392; *Gallo*, 967 F.2d at 1291, *citing California Cooler*, 774 F.2d at 1455. Similarities between the names weigh more heavily than their differences. *Official Airline Guides*, 6 F.3d at 1392 (citing *Rodeo Collection*, 812 F.2d at 1219); *Sleekcraft*, 599 F.2d at 351 (citations omitted).

118. Precious little analysis is required to determine that the name adopted and used by Defendants is exactly the same as Plaintiff's name. Although Defendants added "Inc." to "Committee for Idaho's High Desert" appearing on its articles of incorporation, this fails to distinguish Defendants' from Plaintiff's name in any meaningful way. More importantly, however, the evidence presented at trial established that Defendants have publicly used the name without "Inc." Consequently, the Court finds that the allegedly infringing and infringed names are identical. The Court therefore concludes that this factor weighs heavily in Plaintiff's favor as indicating a likelihood of confusion.

### d. *Evidence of Actual Confusion*

█ 119. Although evidence of actual confusion resulting from the infringing use of a name or mark is strong evidence of likelihood of confusion in the future, "absence of such evidence need not create an inference that there is no likelihood of confusion." *Gallo*, 967 F.2d at 1292 (citing *Levi Strauss*, 778 F.2d at 1360 n. 10). *See also Official Airline Guides*, 6 F.3d at 1394 (citations omitted); *Rodeo Collection*, 812 F.2d at 1219 (citing *New West*, 595 F.2d at 1201; *Sleekcraft*, 599 F.2d at 352–53 (citations omitted)).

120. Having made the necessary findings of fact in this respect, the Court finds and concludes that "consumers" or members of the public were actually confused by the competing organizations' use of identical names.

### e. *Convergence of Marketing Channels*

121. "Convergent marketing channels increase the likelihood of confusion." *Official Airline Guides*, 6 F.3d at 1393 (quoting *Nutri/System*, 809 F.2d at 606); *Sleekcraft*, 599 F.2d at 353.

122. Although this factor is not entirely relevant due to the nature of the activities in which Plaintiff and Defendants are engaged, the evidence does establish, and the Court has found, that both parties' methods of advertisement, communicating their messages, and achieving their purposes are quite similar.

#### f. *Type of Goods and Likely Degree of Consumer Care*

123. In considering the degree of consumer care, the standard is the typical buyer exercising ordinary caution. *Sleekcraft*, 599 F.2d at 353 (citation omitted). "Although the wholly indifferent may be excluded, *McCarthy* at § 23:27, the standard includes the ignorant and the credulous." *Id.* (citing *Stork Restaurant*, 166 F.2d at 358; and *Drexel Ent. v. Hermitage House Furn. Inc.*, 309 F.Supp. 1389, 1390 (D.S.C.1970)). When the goods are expensive, the buyer is presumed to exercise a higher degree of care. *Official Airline Guides*, 6 F.3d at 1393 (citing *Gallo*, 967 F.2d at 1293); *Sleekcraft*, 599 F.2d at 353.

124. Again, this factor is not entirely relevant or controlling because Plaintiff's primary function (and Defendants' professed purpose) is not commercial but consists primarily of the non-profit dissemination of information and pursuit of environmental causes.

It appears to the Court that public officials involved in the public land disputes who solicit or otherwise consider the testimony and proposals by Plaintiff would have a comparatively high degree of sophistication. On the other hand, members of the general public whose views on the environment Plaintiff and Defendants attempt to influence and whose membership each group desires, might simply reject Plaintiff out of hand and without investigation if they learned Defendants' philosophical goals or purposes, due to the similarity of the parties' names.

However, a conclusion based on such considerations in the absence of evidence in the record would be mere speculation. Accordingly, the Court is of the opinion that this factor should be accorded little weight in the determination of likelihood of confusion.

#### g. *Defendants' Intent in Selecting the Name*

125. Defendants' intent in adopting a mark or name similar to Plaintiff's is an important consideration in determining likelihood of confusion, because when an alleged infringer intentionally adopts another's mark, "reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354 (citations omitted), *quoted in Gallo*, 967 F.2d at 1293. Indeed, an alleged infringer's knowing adoption of a mark similar to another's is by itself sufficient for a presumption of an intent to deceive the public. *Official Airline Guides*, 6 F.3d at 1394.

126. The importance of the intent of the alleged infringer in determining secondary meaning is difficult to overstate, for proof of exact copying, without opposing proof, can be sufficient to establish a secondary meaning by itself. *Transgo*, 768 F.2d at 1016 (citing *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557 (9th Cir.1960)). The reason for this is that "[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Transgo*, 768 F.2d at 1016 (quoting *Audio Fidelity*, 283 F.2d at 558).

127. The Court's finding that Defendants knowingly, intentionally, and deliberately copied Plaintiff's name in order to confuse the public, obstruct Plaintiff's pursuit of its environmental agenda, and in the process to obtain an advantage in the snail de-listing litigation by preventing Plaintiff's intervention therein, finds substantial support from the evidence in the record. Therefore, the Court concludes that this factor weighs heavily in favor of a finding of likelihood of confusion.

128. The individual Defendants apparently believed they were entitled to utilize the name in dispute under Idaho law governing the formation and maintenance of corporations. Whether Idaho law actually permits such conduct is questionable; but this issue has no bearing on the federal question presented in the instant action, as the Court indicated in its December 13, 1994 Order (Docket No. 71). Defendants' intentional and deliberate infringement of Plaintiff's name for the purposes described above is not altered or justified by their belief that such conduct is allowed by Idaho law.

### h. *Likelihood of Expansion of Product Lines*

129. Because the Lanham Act affords greater protection against competing goods than against non-competing goods, "a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft,* 599 F.2d at 354, *cited in Official Airline Guides,* 6 F.3d at 1394; *Gallo,* 967 F.2d at 1293. The question presented is whether the parties are likely to compete with a similar product in the same market. *Official Airline Guides,* 6 F.3d at 1394 (citations omitted).

130. Having made the necessary findings of fact in this respect, and having found that Plaintiff and Defendants are in direct competition and opposition with respect to the issues of natural resources and public land management in Idaho's desert regions, the Court concludes that this factor weighs heavily in Plaintiff's favor.

131. Having carefully considered all the evidence and applied the foregoing legal principles, the Court finds that the cumulative weight of all the factors relevant to the determination of likelihood of confusion in this action is very strong and clearly establishes a likelihood of confusion due to Defendants' appropriation, adoption and use of Plaintiff's name. The Court therefore concludes as a matter of law that Defendants infringed Plaintiff's trade name or trademark "Committee for Idaho's High Desert" within the meaning of § 43(a) of the Lanham Act.

132. Furthermore, because likelihood of confusion is an important element establishing secondary meaning, the Court's finding of a clear likelihood of confusion also strongly supports a finding that "Committee for Idaho's High Desert" has acquired secondary meaning due to Plaintiff's use thereof. Having thoroughly reviewed all the evidence, the Court finds that the cumulative weight of all the factors relevant to the determination of secondary meaning in this action strongly indicates the existence of secondary meaning. Indeed, the Court is of the opinion that the Court's finding with respect to the elements of likelihood of confusion, particularly Defen-

dants' intent, may be sufficient by themselves to establish secondary meaning.

Accordingly, the Court concludes as a matter of law that the name "Committee for Idaho's High Desert" has acquired secondary meaning and therefore the distinctiveness of association between Plaintiff and its name necessary for protection under the Lanham Act.

## V.

## SUMMARY AND CONCLUSION

Plaintiff is a non-profit, unincorporated association, and as such it has the right to enforce its rights under § 43(a) of the Lanham Act to enjoin Defendants from infringing Plaintiff's trade name. Fed.R.Civ.P. 17(b)(1). Plaintiff has used the trade name "Committee for Idaho's High Desert" exclusively since 1980.

Plaintiff has established the first element required for trade name infringement, i.e. that it is entitled to protection. Initially, the Court finds that the name "Committee for Idaho's High Desert" is suggestive.

However, because of the difficulty in drawing a distinct line between a "suggestive" and "descriptive" mark, and for purposes of clarity and economy, the Court also felt it necessary to consider whether Plaintiff's name had acquired secondary meaning sufficient for protection even if merely descriptive. In this respect, the Court concludes as a matter of law that even if Plaintiff's name is merely descriptive, it has also acquired secondary meaning.

Accordingly, Plaintiff has established that it has a right to protect its trade name "Committee for Idaho's High Desert" from infringing uses by Defendants under § 43(a) of the Lanham Act, both as a suggestive name and as a descriptive name that has acquired secondary meaning.

Plaintiff has also established and shown that Defendants' use of its name will cause a likelihood of confusion among the relevant consumers, which is the second element required to be established. The Court therefore concludes as a matter of law that Defendants' adoption and use of Plaintiff's name is

likely to cause confusion and has therefore infringed upon Plaintiff's trade name "Committee for Idaho's High Desert."

Plaintiff has established both that its name is entitled to protection and that Defendants infringed its name, therefore irreparable injury absent injunctive relief is presumed.

Accordingly, the Court concludes that Plaintiff is entitled to a permanent injunction, enjoining Defendant corporation, its officers, directors, agents, attorneys, employees, and any other person or entity having notice under Fed.R.Civ.P. 65 from using the name "Committee for Idaho's High Desert" or any other name confusingly similar thereto, and from maintaining any corporate registration utilizing such name.

## VI.

### ORDER

Based on the foregoing, and good cause appearing therefor,

IT IS HEREBY ORDERED that judgment be entered in favor of Plaintiff Committee for Idaho's High Desert. Defendant corporation, its officers, directors, agents, attorneys, employees, and any other person or entity having notice under Fed.R.Civ.P. 65 are hereby ENJOINED from:

(1) using the name "Committee for Idaho's High Desert" or any other name confusingly similar thereto; and

(2) maintaining any corporate registration utilizing such name.

SO ORDERED.